## NATIONAL WOODWORK MANUFACTURERS ASSOCIATION ET AL. v. NATIONAL LABOR RELATIONS BOARD.

No. 110.   Argued January.18 and 19, 1967.—Decided April 17, 1967.*

---

*Together with No. 111, *National Labor Relations Board* v. *National Woodwork Manufacturers Association* et al., also on certiorari to the same court.

*Charles B. Mahin* argued the cause and filed briefs for petitioners in No. 110 and for respondents in No. 111.

*Dominick L. Manoli* argued the cause for respondent in No. 110 and for petitioner in No. 111. With him on the briefs were *Solicitor General Marshall,* *Arnold Ordman* and *Norton J. Come.*

Briefs of *amici curiae* were filed by *William B. Barton* and *Harry J. Lambeth* for the Associated Builders & Contractors, Inc.; by *Gerard D. Reilly* and *Winthrop A. Johns* for the Associated General Contractors of America et al.; by *Kenneth C. McGuiness* and *Stanley R. Strauss* for the American Boiler Manufacturers Association; and by *J. Albert Woll, Robert C. Mayer, Laurence Gold* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Under the Landrum-Griffin Act amendments enacted in 1959, 73 Stat. 542, § 8 (b)(4)(A) of the National Labor Relations Act, 61 Stat. 141, became § 8 (b)(4)(B) and § 8 (e) was added. The questions here are whether, in the circumstances of these cases, the Metropolitan District Council of Philadelphia and Vicinity of the United

Brotherhood of Carpenters and Joiners of America, AFL–CIO (hereafter the Union), committed the unfair labor practices prohibited by §§ 8 (e) and 8 (b)(4)(B).[1]

Frouge Corporation, a Bridgeport, Connecticut, concern, was the general contractor on a housing project in Philadelphia. Frouge had a collective bargaining agreement with the Carpenters' International Union under which Frouge agreed to be bound by the rules and regulations agreed upon by local unions with contractors in areas in which Frouge had jobs. Frouge was therefore subject to the provisions of a collective bargaining agreement between the Union and an organization of Philadelphia contractors, the General Building Contractors Association, Inc. A sentence in a provision of that agreement entitled Rule 17 provides that ". . . No member of this District Council will handle . . . any doors . . . which have been fitted prior to being furnished on the job . . . ."[2] Frouge's Philadelphia project called for 3,600 doors. Customarily, before the doors could be hung on such projects, "blank" or "blind" doors would be mortised for the knob, routed for the hinges, and beveled to make them fit between jambs. These are tasks traditionally

---

[1] The text of these sections appears in the Appendix.

[2] The full text of Rule 17 is as follows:

"No employee shall work on any job on which cabinet work, fixtures, millwork, sash, doors, trim or other detailed millwork is used unless the same is Union-made and bears the Union Label of the United Brotherhood of Carpenters and Joiners of America. No member of this District Council will handle material coming from a mill where cutting out and fitting has been done for butts, locks, letter plates, or hardware of any description, nor any doors or transoms which have been fitted prior to being furnished on job, including base, chair, rail, picture moulding, which has been previously fitted. This section to exempt partition work furnished in sections."

The National Labor Relations Board determined that the first sentence violated § 8 (e), 149 N. L. R. B. 646, 655–656, and the Union did not seek judicial review of that determination.

performed in the Philadelphia area by the carpenters employed on the jobsite. However, precut and prefitted doors ready to hang may be purchased from door manufacturers. Although Frouge's contract and job specifications did not call for premachined doors, and "blank" or "blind" doors could have been ordered, Frouge contracted for the purchase of premachined doors from a Pennsylvania door manufacturer which is a member of the National Woodwork Manufacturers Association, petitioner in No. 110 and respondent in No. 111. The Union ordered its carpenter members not to hang the doors when they arrived at the jobsite. Frouge thereupon withdrew the prefabricated doors and substituted "blank" doors which were fitted and cut by its carpenters on the jobsite.

The National Woodwork Manufacturers Association and another filed charges with the National Labor Relations Board against the Union alleging that by including the "will not handle" sentence of Rule 17 in the collective bargaining agreement the Union committed the unfair labor practice under § 8 (e) of entering into an "agreement . . . whereby [the] employer . . . agrees to cease or refrain from handling . . . any of the products of any other employer . . . ," and alleging further that in enforcing the sentence against Frouge, the Union committed the unfair labor practice under § 8 (b)(4)(B) of "forcing or requiring any person to cease using . . . the products of any other . . . manufacturer . . . ." The National Labor Relations Board dismissed the charges, 149 N. L. R. B. 646.[3] The Board adopted the findings

---

[3] There were also charges of violation of §§ 8 (e) and 8 (b)(4)(B) arising from the enforcement of the Rule 17 provision against three other contractors whose contracts with the owners of the construction projects involved specified that the contractors should furnish and install precut and prefinished doors. The Union refused to permit its members to hang these doors. The Board held that this

of the Trial Examiner that the "will not handle" sentence in Rule 17 was language used by the parties to protect and preserve cutting out and fitting as unit work to be performed by the jobsite carpenters. The Board also adopted the holding of the Trial Examiner that both the sentence of Rule 17 itself and its maintenance against Frouge were therefore "primary" activity outside the prohibitions of §§ 8 (e) and 8 (b)(4)(B). The following statement of the Trial Examiner was adopted by the Board:

> "I am convinced and find that the tasks of cutting out and fitting millwork, including doors, has, at least customarily, been performed by the carpenters employed on the jobsite. Certainly, this provision of rule 17 is not concerned with the nature of the employer with whom the contractor does business nor with the employment conditions of other employers or employees, nor does it attempt to control such other employers or employees. The provision guards against encroachments on the cutting out and fitting work of the contract unit em-

refusal violated § 8 (b)(4)(B). The Board reasoned that, since these contractors (in contrast to Frouge) did not have "control" over the work that the Union sought to preserve for its members, the Union's objective was secondary—to compel the project owners to stop specifying precut doors in their contracts with the employer-contractors. 149 N. L. R. B., at 658. The Union petitioned the Court of Appeals to set aside the remedial order issued by the Board on this finding, but the court sustained the Board. 354 F. 2d 594, 597. The Union did not seek review of the question here. Not before us, therefore, is the issue argued by the AFL–CIO in its brief *amicus curiae,* namely, whether the Board's "right-to-control doctrine—that employees can never strike against their own employer about a matter over which he lacks the legal power to grant their demand"—is an incorrect rule of law inconsistent with the Court's decision in *Labor Board* v. *Insurance Agents' International Union,* 361 U. S. 477, 497–498.

ployees who have performed that work in the past. Its purpose is plainly to regulate the relations between the general contractor and his own employees and to protect a legitimate economic interest of the employees by preserving their unit work. Merely because it incidentally also affects other parties is no basis for invalidating this provision.

"I find that . . . [the provision] is a lawful work-protection or work-preservation provision and that Respondents have not violated Section 8 (e) of the Act by entering into agreements containing this provision and by thereafter maintaining and enforcing this provision." 149 N. L. R. B., at 657.

The Court of Appeals for the Seventh Circuit reversed the Board in this respect. 354 F. 2d 594, 599. The court held that the "will not handle" agreement violated § 8 (e) without regard to any "primary" or "secondary" objective, and remanded to the Board with instructions to enter an order accordingly. In the court's view, the sentence was designed to effect a product boycott like the one condemned in *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, and Congress meant, in enacting § 8 (e) and § 8 (b)(4)(B), to prohibit such agreements and conduct forcing employers to enter into them.

The Court of Appeals sustained, however, the dismissal of the § 8 (b)(4)(B) charge. The court agreed with the Board that the Union's conduct as to Frouge involved only a primary dispute with it and held that the conduct was therefore not prohibited by that section but expressly protected by the proviso "[t]hat nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ." 354 F. 2d, at 597.

We granted certiorari on the petition of the Woodwork Manufacturers Association in No. 110 and on the petition of the Board in No. 111. 384 U. S. 968. We affirm in No. 110 and reverse in No. 111.

## I.

Even on the doubtful premise that the words of § 8 (e) unambiguously embrace the sentence of Rule 17,[4] this does not end inquiry into Congress' purpose in enacting the section. It is a "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459. That principle has particular application in the construction of labor legislation which is "to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests." *Local 1976, United Brotherhood of Carpenters* v. *Labor Board (Sand Door),* 357 U. S. 93, 99–100. See, *e. g., Labor Board* v. *Fruit & Vegetable Packers,* 377 U. S. 58; *Labor Board* v. *Servette, Inc.,* 377 U. S. 46; *Labor Board* v. *Drivers Local Union,* 362 U. S. 274; *Mastro Plastics Corp.* v. *Labor*

---

[4] The statutory language of § 8 (e) is far from unambiguous. It prohibits agreements to "cease . . . from handling . . . any of the products *of any other employer . . . ."* (Emphasis supplied.) Since both the product and its source are mentioned, the provision might be read not to prohibit an agreement relating solely to the nature of the product itself, such as a work-preservation agreement, but only to prohibit one arising from an objection to the other employers or a definable group of employers who are the source of the product, for example, their nonunion status.

*Board,* 350 U. S. 270; *Labor Board* v. *Lion Oil Co.,* 352 U. S. 282; *Labor Board* v. *International Rice Milling Co.,* 341 U. S. 665; *Local 761, Electrical Workers* v. *Labor Board,* 366 U. S. 667.

Strongly held opposing views have invariably marked controversy over labor's use of the boycott to further its aims by involving an employer in disputes not his own. But congressional action to deal with such conduct has stopped short of proscribing identical activity having the object of pressuring the employer for agreements regulating relations between him and his own employees. That Congress meant §§ 8 (e) and 8 (b)(4)(B) to prohibit only "secondary" objectives clearly appears from an examination of the history of congressional action on the subject; we may, by such an examination, "reconstitute the gamut of values current at the time when the words were uttered." [5]

The history begins with judicial application of the Sherman Act (26 Stat. 209) to labor activities. Federal court injunctions freely issued against all manner of strikes and boycotts under rulings that condemned virtually every collective activity of labor as an unlawful restraint of trade.[6] The first congressional response to

---

[5] Letter of Judge Learned Hand, quoted in Lesnick, The Gravamen of the Secondary Boycott, 62 Col. L. Rev. 1363, 1393–1394, n. 155 (1962). See 2 Sutherland, Statutory Construction 321 (Horack ed. 1943): "Before the true meaning of the statute can be determined consideration must be given to the problem in society to which the legislature addressed itself, prior legislative consideration of the problem, the legislative history of the statute under litigation, and to the operation and administration of the statute prior to litigation."

[6] See *Loewe* v. *Lawlor,* 208 U. S. 274, and 235 U. S. 522 (*Danbury Hatters' Case*). The history of this development under the Sherman Act is traced in *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443; *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, 800–803. See generally Berman, Labor and the Sherman Act

vehement labor protests came with § 20 of the Clayton Act in 1914. That section purported drastically to limit the injunction power of federal courts in controversies "involving, or growing out of, a dispute concerning terms or conditions of employment." In terms, it prohibited restraining any person from "ceasing to perform any work or labor" or "from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do." 38 Stat. 738. Labor hailed the law as a charter immunizing its activities from the antitrust laws. This expectation was disappointed when *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, and *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37, held that § 20 immunized only trade union activities directed against an employer by his own employees. In *Duplex,* the union carried on an elaborate scheme to coerce and restrain neutral customers of the complainant manufacturer from dealing with it, with the object of using these customers as an economic lever to bring the nonunion manufacturer to terms. The Court there stated:

"The substance of the matters here complained of is an interference with complainant's interstate trade, intended to have coercive effect upon complainant, and produced by what is commonly known as a 'secondary boycott,' that is, a combination not merely to refrain from dealing with complainant, or to advise. or by peaceful means persuade complainant's customers to refrain ('primary boycott'), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them

---

(1930). Collective activity was also being restrained through the doctrine of "malicious combination." See *Duplex Printing Press Co.* v. *Deering, supra,* at 484–485 (Brandeis, J., dissenting); see generally Laidler, Boycotts and the Labor Struggle 189–194 (1914).

to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it." *Duplex Printing Press Co. v. Deering, supra*, at 466.

Thus "primary" but not "secondary" pressures were excepted from the antitrust laws. *Truax v. Corrigan*, 257 U. S. 312, 330, defined "secondary boycott" as one "where many combine to injure one in his business by coercing third persons against their will to cease patronizing him by threats of similar injury. . . . The question in such cases is whether the moral coercion exercised over a stranger to the original controversy by steps in themselves legal becomes a legal wrong." See 1 Teller, Labor Disputes and Collective Bargaining § 145 (1940).[7] Commentators of the day, while noting the ambiguity which lurked in the definition, discerned its core concept: union pressure directed at a neutral employer the object of which was to induce or coerce him to cease doing business with an employer with whom the union was engaged in a labor dispute.[8]

In 1932 Congress enacted the Norris-LaGuardia Act and tipped the scales the other way. Its provisions "established that the allowable area of union activity was not to be restricted, as it had been in the *Duplex* case, to an immediate employer-employee relation." *United*

---

[7] *Painters District Council v. United States*, 284 U. S. 582, which summarily affirmed 44 F. 2d 58, also involved secondary activity within the rubric of *Duplex*; the union, whose members' primary employers were painting contractors, sought to "compel *manufacturers* to bring their products into the state unfinished . . . ." 44 F. 2d, at 59. (Emphasis supplied.)

[8] See Laidler, *op. cit. supra*, n. 6, at 64; Clark, The Law of the Employment of Labor 289–290 (1911); Oakes, Organized Labor and Industrial Conflicts § 408 (1927); Frankfurter & Greene, The Labor Injunction 43 (1930).

*States* v. *Hutcheson,* 312 U. S. 219, 231.[9] Congress abolished, for purposes of labor immunity, the distinction between primary activity between the "immediate disputants" and secondary activity in which the employer disputants and the members of the union do not stand "in the proximate relation of employer and employee . . . ." H. R. Rep. No. 669, 72d Cong., 1st Sess., 8 (1932). Thus, in *Hutcheson, supra,* the Court held that the Norris-LaGuardia Act immunized a jurisdictional strike trapping a neutral employer in the middle of an "internecine struggle between two unions seeking the favor of the same employer," *supra,* at 232. Commentators of the post-Norris-LaGuardia era, as those before, while continuing to deplore the chameleon-like qualities of the term "secondary boycott," agreed upon its central aspect: pressure tactically directed toward a neutral employer in a labor dispute not his own.[10]

Labor abuses of the broad immunity granted by the Norris-LaGuardia Act resulted in the Taft-Hartley Act prohibitions against secondary activities enacted in § 8 (b)(4)(A), which, as amended in 1959, is now § 8 (b)(4)(B). As will appear, the basic thrust of the

---

[9] Section 13 (c) of the Norris-LaGuardia Act provided that the term labor dispute and thus the scope of immunity "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employee.*" 47 Stat. 73. (Emphasis supplied.)

[10] See 1 Teller, Labor Disputes and Collective Bargaining § 145 (1940); Barnard & Graham, Labor and the Secondary Boycott, 15 Wash. L. Rev. 137 (1940); Smith, Coercion of Third Parties in Labor Disputes—The Secondary Boycott, 1 La. L. Rev. 277 (1939); Hellerstein, Secondary Boycotts in Labor Disputes, 47 Yale L. J. 341, 364 (1938).

accommodation there effected by Congress was not expanded by the Landrum-Griffin amendments. The congressional design in enacting §8 (b)(4)(A) is therefore crucial to the determination of the scope of §§ 8 (e) and 8 (b)(4)(B). Senator Taft said of its purpose:

"This provision makes it unlawful to resort to a *secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees*. . . . [U]nder the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. *All this provision of the bill does is to reverse the effect of the law as to secondary boycotts.*" [11]    (Emphasis supplied.)

Senator Taft and others frequently sounded this note that §8 (b)(4)(A) was designed to eliminate the "secondary boycott," [12] and its proponents uniformly cited examples of union conduct which evidenced labor efforts to draw in neutral employers through pressure calculated to induce them to cease doing business with the primary employer. [13]    And the Senate Committee Report carefully

[11] 93 Cong. Rec. 4198, II Legislative History of the Labor Management Relations Act, 1947 (hereafter 1947 Leg. Hist.), 1106.

[12] See, *e. g.*, S. Rep. No. 105, 80th Cong., 1st Sess., 7, 8, 22, 54, in I 1947 Leg. Hist. 413, 414, 428, 460; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 43, in I 1947 Leg. Hist. 547; 93 Cong. Rec. 4131, 4138, 4837–4838, 4843, 4844, 4858, 4859, 4865, 5005, 5011, 5014, 6445–6446, 7537, in II 1947 Leg. Hist. 1055, 1068, 1354–1355, 1364, 1365, 1370–1371, 1372–1373, 1383, 1479, 1491, 1497, 1544, 1654.  A statement of Senator Javits, an opponent of the bill, at 93 Cong. Rec. 6296, I 1947 Leg. Hist. 876, that might suggest a broader reading was merely one of the "isolated references . . . [that] appear more as asides in a debate . . . ." *Labor Board* v. *Drivers Local Union*, 362 U. S. 274, 286–287.

[13] See, *e. g.*, 93 Cong. Rec. 3424 (Rep. Hartley), 3432 (Rep. Landis), 3449 (Rep. Buck), A1910–A1911 (Rep. Meade), 1844 (Sena-

characterized the conduct prohibited by § 8 (b)(4)(A) in the same terms:

"Thus, it would not be lawful for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B; nor would it be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of or does business with employer B (with whom the union has a dispute)." . S. Rep. No. 105, 80th Cong., 1st Sess., 22, I 1947 Leg. Hist. 428.[14]

The other subsections of § 8 (b)(4) of the Act were similarly limited to protecting employers in the position of neutrals between contending parties. The prohibition of subsection (B) against a noncertified union's forcing recognition from an employer was designed to protect the employer trapped between the union and his employees, a majority of whom may not desire to choose the union as their representative. The prohibition of subsection (C) against a demand for recognition when another union has been certified protects the employer trapped between the noncertified and the certified unions. The prohibition of subsection (D) against coercion to force an employer to assign certain work to one of two unions contesting for it protects the employer trapped between the two claims. The central theme pervading these provisions of protection for the neutral employer confirms the assurances of those sponsoring the section that in subsection (A) Congress likewise meant to protect the

tor Morse), 3838 (Senator Taft); 5014 (Senator Ball), in I 1947 Leg. Hist. 614, 630, 658, 869, and II 1947 Leg. Hist. 982, 1012, 1497.

[14] See also a similar statement in H. R. Conf. Rep. No. 510, *supra*, at 43, I 1947 Leg. Hist. 547, in which the House Managers limit the "boycotts," referred to at 65, I 1947 Leg. Hist. 569.

employer only from union pressures designed to involve him in disputes not his own.[15]

Judicial decisions interpreting the broad language of § 8 (b)(4)(A) of the Act uniformly limited its application to such "secondary" situations.[16] This limitation was in "conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and

[15] Cf. *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 285; *Labor Board* v. *Lion Oil Co.,* 352 U. S. 282, 288.

[16] See, *e. g., Di Giorgio Fruit Corp.* v. *Labor Board,* 89 U. S. App. D. C. 155, 191 F. 2d 642, cert. denied, 342 U. S. 869 (1951); *J. G. Roy & Sons Co.* v. *Labor Board,* 251 F. 2d 771 (C. A. 1st Cir. 1958); *Rabouin* v. *Labor Board,* 195 F. 2d 906, 912 (C. A. 2d Cir. 1952); *Piezonki* v. *Labor Board,* 219 F. 2d 879 (C. A. 4th Cir. 1955); *Labor Board* v. *General Drivers Local 968,* 225 F. 2d 205 (C. A. 5th Cir. 1955), cert. denied, 350 U. S. 914; *Local 618, Automotive Petroleum Employees Union* v. *Labor Board,* 249 F. 2d 332 (C. A. 8th Cir. 1957); *Labor Board* v. *Local Union No. 55,* 218 F. 2d 226 (C. A. 10th Cir. 1954). An oft-cited definition of the conduct banned by § 8 (b)(4)(A) was that of Judge Learned Hand in *International Bro. of Electrical Workers* v. *Labor Board,* 181 F. 2d 34, 37: "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." For the scholarly acceptance of this primary-secondary dichotomy in the scope of § 8 (b)(4)(A), see Koretz, Federal Regulation of Secondary Strikes and Boycotts—A New Chapter, 37 Cornell L. Q. 235 (1952); Tower, A Perspective on Secondary Boycotts, 2 Lab. L. J. 727 (1951); Cushman, Secondary Boycotts and the Taft-Hartley Law, 6. Syracuse L. Rev. 109 (1954); Lesnick, The Gravamen of the Secondary Boycott, 62 Col. L. Rev. 1363 (1962); Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn. L. Rev. 257, 271 (1959); Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 1086, 1112 (1960). For the NLRB's vacillations during the period, see Lesnick, *supra,* 62 Col. L. Rev., at 1366–1392.

others from pressures in controversies not their own." *Labor Board* v. *Denver Bldg. Trades Council,* 341 U. S. 675, 692. This Court accordingly refused to read § 8 (b) (4)(A) to ban traditional primary strikes and picketing having an impact on neutral employers even though the activity fell within its sweeping terms. *Labor Board* v. *International Rice Milling Co.,* 341 U. S. 665; see *Local 761, Electrical Workers* v. *Labor Board,* 366 U. S. 667. Thus, however severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective.

The literal terms of § 8 (b)(4)(A) also were not applied in the so-called "ally doctrine" cases, in which the union's pressure was aimed toward employers performing the work of the primary employer's striking employees. The rationale, again, was the inapplicability of the provision's central theme, the protection of neutrals against secondary pressure, where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute. "[T]he union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it." *Douds* v. *Metropolitan Federation of Architects,* 75 F. Supp. 672, 677 (D. C. S. D. N. Y. 1948); see *Labor Board* v. *Business Machine & Office Appliance Mechanics,* 228 F. 2d 553 (C. A. 2d Cir. 1955). We summarized our reading of § 8 (b)(4)(A) just a year before enactment of § 8 (e):

> "It aimed to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict: the coercion of neutral employers, themselves not concerned with a primary labor dispute, through the inducement of their employees to en-

gage in strikes or concerted refusals to handle goods."
*Local 1976, United Brotherhood of Carpenters* v.
*Labor Board (Sand Door)*, 357 U. S. 93, 100.

Despite this virtually overwhelming support for the
limited reading of § 8 (b)(4)(A), the Woodwork Manu-
facturers Association relies on *Allen Bradley Co.* v. *Local
Union No. 3*, 325 U. S. 797, as requiring that the suc-
cessor section, § 8 (b)(4)(B), be read as proscribing the
District Council's conduct in enforcing the "will not
handle" sentence of Rule 17 against Frouge. The Asso-
ciation points to the references to *Allen Bradley* in the
legislative debates leading to the enactment of the prede-
cessor § 8 (b)(4)(A). We think that this is an erroneous
reading of the legislative history. *Allen Bradley* held
violative of the antitrust laws a combination between
Local 3 of the International Brotherhood of Electrical
Workers and both electrical contractors and manufac-
turers of electrical fixtures in New York City to restrain
the bringing in of such equipment from outside the city.
The contractors obligated themselves to confine their pur-
chases to local manufacturers, who in turn obligated
themselves to confine their New York City sales to con-
tractors employing members of the local, and this scheme
was supported by threat of boycott by the contractors'
employees. While recognizing that the union might have
had an immunity for its contribution to the trade boycott
had it acted alone, citing *Hutcheson, supra,* the Court
held immunity was not intended by the Clayton or
Norris-LaGuardia Acts in cases in which the union's
activity was part of a larger conspiracy to abet contractors
and manufacturers to create a monopoly.

The argument that the references to *Allen Bradley* in
the debates over § 8 (b)(4)(A) have broader significance
in the determination of the reach of that section is that
there was no intent on Local 3's part to influence the
internal labor policies of the boycotted out-of-state

manufacturers of electrical equipment. There are three answers to this argument: First, the boycott of out-of-state electrical equipment by the electrical contractors' employees was not in pursuance of any objective relating to pressuring their employers in the matter of *their* wages, hours, and working conditions; there was no work preservation or other primary objective related to the union employees' relations with their contractor employers. On the contrary, the object of the boycott was to secure benefits for the New York City electrical manufacturers and their employees. "This is a secondary object because the cessation of business was being used tactically, with an eye to its effect on conditions elsewhere."[17] Second, and of even greater significance on the question of the inferences to be drawn from the references to *Allen Bradley*, Senator Taft regarded the Local 3 boycott as in effect saying, "We will not permit any material made by any other union or by any non-union workers to come into New York City and be put into any building in New York City." 93 Cong. Rec. 4199, II 1947 Leg. Hist. 1107. This clearly shows that the Senator viewed the pressures applied by Local 3 on the employers of its members as having solely a secondary objective. The Senate Committee Report echoes the same view:

> "[It is] an unfair labor practice for a union to engage in the type of secondary boycott that has

[17] Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8 (b)(4) and 8 (e), 113 U. Pa. L. Rev. 1000, 1017–1018 (1965).

It is suggested that the boycott in *Allen Bradley* is indistinguishable from the activity today held protected in *Houston Insulation Contractors Association* v. *Labor Board, post,* p. 664. The crucial distinction is that in *Houston Insulation Contractors Association* the boycott was being carried out to affect the labor policies of the employer of the boycotting employees, the primary employer, and not, as in *Allen Bradley*, for its effect elsewhere.

been conducted in New York City by local No. 3 of the IBEW, whereby electricians have refused to install electrical products of manufacturers employing electricians who are members of *some labor organization other than local No. 3."* S. Rep. No. 105, 80th Cong., 1st Sess., 22, I 1947 Leg. Hist. 428. (Emphasis supplied.)

Other statements on the floor of Congress repeat the same refrain.[18] Third, even on the premise that Congress meant to prohibit boycotts such as that in *Allen Bradley* without regard to whether they were carried on to affect labor conditions elsewhere, the fact is that the boycott in *Allen Bradley* was carried on, not as a shield to preserve the jobs of Local 3 members, traditionally a primary labor activity, but as a sword, to reach out and monopolize all the manufacturing job tasks for Local 3 members. It is arguable that Congress may have viewed the use of the boycott as a sword as different from labor's traditional concerns with wages, hours, and working conditions. But the boycott in the present cases was not used as a sword; it was a shield carried solely to preserve the members' jobs. We therefore have no occasion today to decide the questions which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire

---

[18] See 93 Cong. Rec. 4132 (Senator Ellender), II 1947 Leg. Hist. 1056: "A secondary boycott, as all of us know, is a concerted attempt on the part of a strong union to compel employers to deal with them, even though the employees of that employer desire to be represented by other unions, or not to be represented at all. . . . [An] example is the New York Electrical Workers Union, the IBEW." See also Statement of Senator Ball, 93 Cong. Rec. 5011, II 1947 Leg. Hist. 1491, who described "one of the worst situations which has arisen, such as that in New York where a local of the IBEW is using the secondary boycott to maintain a tight little monopoly for its own employees, its own members, and a few employers in that area."

new job tasks when their own jobs are not threatened by the boycotted product.[19]

It is true that the House bill proposed to amend the Clayton Act to narrow labor's immunity from the antitrust laws. H. R. 3020, § 301 (b), I 1947 Leg. Hist. 220. This was omitted from the Conference agreement. It is suggested that this history evidences that Congress meant § 8 (b)(4)(A) to reach all product boycotts with work preservation motives. The argument is premised on a statement by the House Managers in the House Conference Report that "[s]ince the matters dealt with in this section have to a large measure been effectuated through the use of boycotts, and since the conference agreement contains effective provisions directly dealing with boycotts themselves, this provision is omitted from the conference agreement." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 65, I 1947 Leg. Hist. 569. The statement is hardly probative that § 8 (b)(4)(A) enacted a broad prohibition in face of the overwhelming evidence that its Senate sponsors intended the narrower reach. Actually the statement at best reflects that the House may have receded from a broader position and accepted that of the Senate. For § 8 (b)(4)(A) constituted the "effective provisions" referred to and the House Managers' understanding of and agreement with the reach of the section as intended by its Senate sponsors is expressed at page 43 of the same Report, I 1947 Leg. Hist. 547:

> "Under clause (A) strikes or boycotts, or attempts to induce or encourage such action, were made unfair labor practices if the purpose was to force an employer or other person to cease using, selling,

---

[19] We likewise do not have before us in these cases, and express no view upon, the antitrust limitations, if any, upon union-employer work-preservation or work-extension agreements. See *United Mine Workers* v. *Pennington*, 381 U. S. 657, 662–665.

handling, transporting, or otherwise dealing in the
products of another, or to cease doing business with
any other person.  Thus it was made an unfair labor
practice for a union to engage in a strike against
employer A for the purpose of forcing that employer
to cease doing business with employer B.  Similarly
it would not be lawful for a union to boycott em-
ployer A because employer A uses or otherwise deals
in the goods of, or does business with, employer B."

In effect Congress, in enacting § 8 (b)(4)(A) of the
Act, returned to the regime of *Duplex Printing Press Co.*
and *Bedford Cut Stone Co., supra,* and barred as a sec-
ondary boycott union activity directed against a neutral
employer, including the immediate employer when in fact
the activity directed against him was carried on for its
effect elsewhere.

Indeed, Congress in rewriting § 8 (b)(4)(A) as
§ 8 (b)(4)(B) took pains to confirm the limited appli-
cation of the section to such "secondary" conduct.  The
word "concerted" in former § 8 (b)(4) was deleted to
reach secondary conduct directed to only one individual.
This was in response to the Court's holding in *Labor
Board* v. *International Rice Milling Co.,* 341 U. S. 665,
that "concerted" required proof of inducement of two
or more employees.  But to make clear that the dele-
tion was not to be read as supporting a construction
of the statute as prohibiting the incidental effects of tra-
ditional primary activity, Congress added the proviso
that nothing in the amended section "shall be construed
to make unlawful, where not otherwise unlawful, any
primary strike or primary picketing." [20]  Many state-

---

[20] The proviso was added in the Conference Committee, the report
of which stated its purpose to be, "to make it clear that the changes
in section 8 (b)(4) do not overrule or qualify the present rules of law
permitting picketing at the site of a primary labor dispute." H. R.

ments and examples proffered in the 1959 debates confirm this congressional acceptance of the distinction between primary and secondary activity.[21]

## II.

The Landrum-Griffin Act amendments in 1959 were adopted only to close various loopholes in the application of § 8 (b)(4)(A) which had been exposed in Board and court decisions. We discussed some of these loopholes, and the particular amendments adopted to close them, in *Labor Board* v. *Servette, Inc.*, 377 U. S. 46, 51–54. We need not repeat that discussion here, except to emphasize, as we there said, that "these changes did not expand the type of conduct which § 8 (b)(4)(A) con-

Conf. Rep. No. 1147, 86th Cong., 1st Sess., 38 (1959), in I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (hereafter 1959 Leg. Hist.), 942. See *Local 761, Electrical Workers* v. *Labor Board,* 366 U. S. 667, 681.

[21] See 105 Cong. Rec. 1729–1730, II 1959 Leg. Hist. 993–994 (remarks of the Secretary of Labor, inserted into the record by Senator Dirksen); 105 Cong. Rec. 3951–3952, 6290, 6667, II 1959 Leg. Hist. 1007, 1052, 1193–1194 (Senator McClellan); 105 Cong. Rec. 6285, II 1959 Leg. Hist. 1046 (Senator Ervin); 105 Cong. Rec. 6300–6301, II 1959 Leg. Hist. 1059 (Senator Mundt); 105 Cong. Rec. 6390, 6428, 17674, II 1959 Leg. Hist. 1061, 1079, 1386 (Senator Goldwater); 105 Cong. Rec. 6670, 17907–17908, II 1959 Leg. Hist. 1197, 1440–1441 (Senator Curtis); 105 Cong. Rec. 1426, 15674, II 1959 Leg. Hist. 1462, 1616 (Rep. Bosch); 105 Cong. Rec. 3926–3927, 3928, II 1959 Leg. Hist. 1469–1470, 1471 (Rep. Lafore); 105 Cong. Rec. 14343–14344, II 1959 Leg. Hist. 1518–1519 (Rep. Landrum); 105 Cong. Rec. 14347–14348, II 1959 Leg. Hist. 1522–1523 (analysis of Landrum-Griffin bill inserted into the record by Rep. Griffin); 105 Cong. Rec. 15532, II 1959 Leg. Hist. 1568 (Rep. Griffin); 105 Cong. Rec. 15195, 15544–15545, II 1959 Leg. Hist. 1543, 1580–1581 (Rep. Rhodes); 105 Cong. Rec. 15529, II 1959 Leg. Hist. 1565 (Rep. Shelley); 105 Cong. Rec. 15551–15552, II 1959 Leg. Hist. 1587–1588 (report prepared by Rep. Elliott); 105 Cong. Rec. 15688, II 1959 Leg. Hist. 1630 (Rep. Riehlman); 105 Cong. Rec. 15691, II 1959 Leg. Hist. 1633 (Rep. Arends).

demned, that is, union pressures calculated to induce the employees of a secondary employer to withhold their services in order to force their employer to cease dealing with the primary employer." *Id.*, at 52–53.

. Section 8 (e) simply closed still another loophole.[22] In *Local 1976, United Brotherhood of Carpenters* v. *Labor Board (Sand Door)*, 357 U. S. 93, the Court held that it was no defense to an unfair labor practice charge under § 8 (b)(4)(A) that the struck employer had agreed, in a contract with the union, not to handle nonunion material. However, the Court emphasized that the mere execution of such a contract provision (known as a "hot cargo" clause because of its prevalence in Teamsters Union contracts), or its voluntary observance by the employer, was not unlawful under § 8 (b)(4)(A). Section 8 (e) was designed to plug this gap in the legislation by making the "hot cargo" clause itself unlawful. The *Sand Door* decision was believed by Congress not only to create the possibility of damage actions against employers for breaches of "hot cargo" clauses, but also to create a situation in which such clauses might be employed to exert subtle pressures upon employers to engage in "voluntary" boycotts.[23] Hearings in late 1958 before the Senate Select Committee explored seven cases of "hot cargo" clauses in Teamsters Union contracts, the use of which the Committee found conscripted neutral employers in Teamsters organizational campaigns.[24]

---

[22] Throughout the committee reports and debates on § 8 (e), it was referred to as a measure designed to close a loophole in § 8 (b)(4)(A) of the 1947 Act. See, *e. g.*, S. Rep. No. 187, 86th Cong., 1st Sess., 78–79, I 1959 Leg. Hist. 474–475 (1959) (Minority Views); H. R. Rep. No. 741, 86th Cong., 1st Sess., 20–21, I 1959 Leg. Hist. 778–779.

[23] See Cox, *supra*, n. 16, at 272.

[24] See Final Report of the Senate Select Committee on Improper Activities in the Labor or Management Field, S. Rep. No. 1139, 86th Cong., 2d Sess., 3 (1960). The Final Report, ordered to be

This loophole-closing measure likewise did not expand the type of conduct which § 8 (b)(4)(A) condemned. Although the language of § 8 (e) is sweeping, it closely tracks that of § 8 (b)(4)(A), and just as the latter and its successor § 8 (b)(4)(B) did not reach employees' activity to pressure their employer to preserve for themselves work traditionally done by them, § 8 (e) does not prohibit agreements made and maintained for that purpose.

The legislative history of § 8 (e) confirms this conclusion. The Kennedy-Ervin bill as originally reported proposed no remedy for abuses of the "hot cargo" clauses revealed at the hearings of the Select Committee. Senators Goldwater and Dirksen filed a minority report urging that a prohibition against "hot cargo" clauses should be enacted to close that loophole. Their statement expressly acknowledged their acceptance of the reading of § 8 (b)(4)(A) as applicable only "to protect genuinely neutral employers and their employees, not themselves involved in a labor dispute, against economic coercion designed to give a labor union victory in a dispute with some other employer." [25] They argued that a prohibition

---

printed after enactment of the Landrum-Griffin Act, defined a "hot cargo" clause as "an agreement between a union and a unionized employer that his employees shall not be required to work on or handle 'hot goods' or 'hot cargo' being manufactured or transferred by another employer with whom the union has a labor dispute or whom the union considers and labels as being unfair to organized labor." *Ibid.*

[25] S. Rep. No. 187, 86th Cong., 1st Sess., 78, I 1959 Leg. Hist. 474. The Senators explained, at 79, I 1959 Leg. Hist. 475:

*"Hot-cargo clauses.*—It has become common to find clauses in union contracts whereby the employer agrees not to handle what the union chooses to call 'hot goods,' 'unfair materials,' and 'blacklisted products.' Such clauses have become standard in contracts entered into by the Teamsters Union. Here, employer A, who has a dispute with a union or whose employees are being solicited for

against "hot cargo" clauses was necessary to further that objective. They were joined by Senator McClellan, Chairman of the Select Committee, in their proposal to add such a provision. Their statements in support consistently defined the evil to be prevented in terms of agreements which obligated neutral employers not to do business with other employers involved in labor disputes with the union.[26] Senator Gore initially proposed, and the Senate first passed, a "hot cargo" amendment to the Kennedy-Ervin bill which outlawed such agreements only for "common carriers subject to Part II of the Interstate Commerce Act." This reflected the testimony at the Select Committee hearings which attributed abuses of such clauses primarily to the Teamsters Union. Significantly, such alleged abuses by the Teamsters invariably involved uses of the clause to pressure neutral trucking employers not to handle goods of other employers involved in disputes with the Teamsters Union.[27]

union membership, is in real trouble. He may have customers waiting for his product or he may have suppliers eager to send him raw material, but both his delivery of products and supply of raw material cannot move from or to his place of business because the carriers in either instance have 'hot cargo' clauses in their contracts with the Teamsters Union. His alternative is . . . [to] go out of business or yield to the union's demand, which often is a demand for a compulsory membership contract with a union which his employees do not want."

[26] See statements of these Senators, cited n. 21, *supra*. Both Senators Dirksen and McClellan introduced unsuccessful "hot cargo" legislation in substantially the same terms as enacted in § 8 (e), 105 Cong. Rec. 3948, 6411–6412, II 1959 Leg. Hist. 1007 (Senator McClellan), 1071 (Senator Dirksen).

[27] See, *e. g.*, remarks of Secretary of Labor Mitchell inserted into the record by Senator Dirksen, 105 Cong. Rec. 1730, II 1959 Leg. Hist. 993: "The testimony before the select committee again and again illustrated the method by which certain unions, particularly the Teamsters, utilized the inadequacies of the present secondary boycott provisions to force employers to do business with only those people approved by union officials."

The House Labor Committee first reported out a bill containing a provision substantially identical to the Gore amendment.[28]  The House Report expressly noted that since that proposal tracked the language of § 8 (b)(4)(A) "it preserved the established distinction between primary activities and secondary boycotts." [29]  The substitute Landrum-Griffin bill, however, expanded the proposal to cover all industry and not common carriers alone.  H. R. 8400, § 705 (b)(1) in I 1959 Leg. Hist. 683.  Representative Landrum stated, "I submit if such contracts are bad in one segment of our economy, they are undesirable in all segments."  105 Cong. Rec. 14343, II 1959 Leg. Hist. 1518.  In describing the substitute bill, Representative Landrum pointedly spoke of the situation "where the union, in a dispute with one employer, puts pressure upon another employer or his employees, in order to force the second employer or his employees, to stop doing business with the first employer, and 'bend his knee to the union's will.'"  *Ibid.*  An analysis of the substitute bill submitted by Representative Griffin referred to the need to plug the various loopholes in the "secondary boycott" provisions, one of which is the "hot cargo" agreement.[30]  In Conference Committee, the Landrum-Griffin application to all industry, and not just to common carriers, was adopted.

However, provisos were added to § 8 (e) to preserve the *status quo* in the construction industry, and exempt the garment industry from the prohibitions of §§ 8 (e)

---

[28] H. R. 8342, § 705 (a)(2)  (Elliott bill), in I 1959 Leg. Hist. 755–757.

[29] H. R. Rep. No. 741, 86th Cong., 1st Sess., 21, I 1959 Leg. Hist. 779.

[30] 105 Cong. Rec. 14347, II 1959 Leg. Hist. 1522–1523.  Rep. Griffin noted that the present law did not "prohibit resort to . . . [secondary] activity to force [secondary] employers to sign contracts or agreements not to handle or transport goods coming from a source characterized by a union as 'unfair.'"

and 8 (b)(4)(B). This action of the Congress is strong confirmation that Congress meant that both §§ 8 (e) and 8 (b)(4)(B) reach only secondary pressures. If the body of § 8 (e) applies only to secondary activity, the garment industry proviso is a justifiable exception which allows what the legislative history shows it was designed to allow, secondary pressures to counteract the effects of sweatshop conditions in an industry with a highly integrated process of production between jobbers, manufacturers, contractors and subcontractors.[31] First, this motivation for the proviso sheds light on the central theme of the body of § 8 (e), to which the proviso is an exception. Second, if the body of that provision and § 8 (b)(4)(B) were construed to prohibit primary agreements and their maintenance, such as those concerning work preservation, the proviso would have the highly unlikely effect, unjustified in any of the statute's history, of permitting garment workers, but garment workers only, to preserve their jobs against subcontracting or prefabrication by such agreements and by strikes and boycotts to enforce them. Similarly, the construction industry proviso, which permits "hot cargo" agreements only for jobsite work, would have the curious and unsupported result of allowing the construction worker to make agreements preserving his traditional tasks against jobsite prefabrication and subcontracting, but not against nonjobsite prefabrication and subcontracting. On the other hand, if the heart of § 8 (e) is construed to be directed only to secondary activities, the construction proviso becomes, as it was intended to be, a measure designed to allow agreements pertaining to certain secondary activities on the construction site be-

---

[31] See, e. g., 105 Cong. Rec. 6668, 17327, II 1959 Leg. Hist. 1195, 1377 (Senator Kennedy).

cause of the close community of interests there,[32] but to ban secondary-objective agreements concerning nonjobsite work, in which respect the construction industry is no different from any other. The provisos are therefore substantial probative support that primary work preservation agreements were not to be within the ban of § 8 (e).[33]

The only mention of a broader reach for § 8 (e) appears in isolated statements by opponents of that provision, expressing fears that work preservation agreements would be banned.[34] These statements have scant probative value against the backdrop of the strong evidence to the contrary. Too, "we have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to

---

[32] See *Essex County and Vicinity Dist. Council of Carpenters* v. *Labor Board,* 332 F. 2d 636 (C. A. 3d Cir. 1964); Comment, The Impact of the Taft-Hartley Act on the Building and Construction Industry, 60 Yale L. J. 673, 684–689 (1951).

[33] See *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 285–286, and cases there cited.

[34] 105 Cong. Rec. 17884, II 1959 Leg. Hist. 1428 (Senator Morse); 105 Cong. Rec. 16590, II 1959 Leg. Hist. 1708 (analysis of "Secondary Boycotts and Hot Cargo Contracts" by Senator Kennedy and Rep. Thompson). It is somewhat unclear whether statements by Senator McNamara and Reps. Thompson and Kearns respecting plumbing prefabrication clauses for construction projects concerned agreements with a primary or a secondary objective. 105 Cong. Rec. 19785, 19809, 20004–20005, II 1959 Leg. Hist. 1815, 1816, 1861. As described by Senator McNamara, the clause in question permitted fabrication, so long as it was accomplished by members of a local union of the pipefitters. 105 Cong. Rec. 19785, II 1959 Leg. Hist. 1815. Moreover, the statements purported only to indicate their interpretation of the construction industry proviso. In any event, these statements could represent only the personal views of these legislators, since the statements were inserted in the Congressional Record after passage of the Act.

overstate its·reach." *Labor Board* v. *Fruit & Vegetable Packers,* 377 U. S. 58, 66. "It is the sponsors that we ·look to when the meaning of the statutory words is in doubt." *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384, 394–395. See *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 288.

In addition to all else, "[t]he silence of the sponsors of [the] amendments is pregnant with significance. . . ." *Labor Board* v. *Fruit & Vegetable Packers, supra,* at 66. Before we may say that Congress meant to strike from workers'.hands the economic weapons traditionally used against their employers' efforts to abolish their jobs, that meaning should plainly appear. · "[I]n this era of automation and onrushing technological change; no problems in the domestic economy are of greater concern than those involving job security and employment stability. Because of the potentially cruel impact upon the lives and fortunes of the working men and women of the Nation, these problems have understandably· engaged the solicitous attention of government, of responsible private business, and particularly of organized labor." *Fibreboard Paper Prods. Corp.* v. *Labor Board,* 379 U. S. 203, 225 (concurring opinion of STEWART, J.). We would expect that legislation curtailing the·ability of management and labor voluntarily to negotiate for solutions to these significant and difficult problems would be preceded by extensive congressional study and debate, and consideration of ·voluminous economic, scientific, and statistical data. The silence regarding such matters in the Eighty-sixth Congress is itself evidence that Congress, in enacting § 8 (e), had no thought of prohibiting agreements directed to work preservation.[35] In fact, since the

---

[35] In fact, Rep. Alger introduced a bill which would have banned union attempts to limit prefabrication of building materials, which .bill was given no attention whatever and failed of adoption. 105 'Cong. Rec. 12137, II 1959 Leg. Hist. 1508. The understanding of

enactment of § 8 (e), the Subcommittee on Employment and Manpower of the Senate Committee on Labor and Public Welfare, and the Subcommittee on Unemployment and the Impact of Automation and the Select Subcommittee on Labor of the House Committee on Education and Labor have been extensively studying the threats to workers posed by increased technology and automation,[36] and some legislation directed to the prob-

Congress with regard to that issue might have been best reflected in a statement on the House floor by Rep. Holland: "When the labor reform bill is out of the way—labor and management could, as they eventually must, sit down together and work toward a solution of our most serious problem—automation—which has already affected the employment picture through more productivity and less employment. If allowed to go unchecked, automation will eventually create many thousands of displaced persons, and unless this problem is properly worked out, it portends a serious threat to our national economy." 105 Cong. Rec. 13133, II 1959 Leg. Hist. 1511.

[36] See Hearings before the Subcommittee on Employment and Manpower of the Senate Committee on Labor and Public Welfare, 88th Cong., 1st Sess., pts. 1–9 (1963), 88th Cong., 2d Sess., pt. 10 (1964), on the Nation's Manpower Revolution (concluding with recommendations for a National Commission on Automation and Technological Progress), and Hearings, 88th Cong., 1st Sess. (1963), on Manpower Retraining; Hearings before the Select Subcommittee on Labor of the House Committee on Education and Labor, 88th Cong., 2d Sess. (1964), on H. R. 10310 and Related Bills "To Establish a National Commission on Automation and Technological Progress"; Hearings before the Subcommittee on Unemployment and the Impact of Automation of the House Committee on Education and Labor, 87th Cong., 1st Sess. (1961), on H. R. 7373, a "Bill Relating to the Occupational Training, Development, and Use of the Manpower Resources of the Nation." See statement in these latter hearings of then Secretary of Labor, Arthur Goldberg, at 3: "Many achievements in attempting to overcome the difficulties created by radical technological change can and should be accomplished through collective bargaining and joint labor-management efforts. Much has been achieved through such efforts in recent years. Even greater concentration by labor and management on these problems is needed in the period ahead."

lem has been passed.[37] We cannot lightly impute to Congress an intent in § 8 (e) to preclude labor-management agreements to ease these effects through collective bargaining on this most vital problem created by advanced technology.

Moreover, our decision in *Fibreboard Paper Prods. Corp., supra,* implicitly recognizes the legitimacy of work preservation clauses like that involved here. Indeed, in the circumstances presented in *Fibreboard,* we held that bargaining on the subject was made mandatory by § 8(a)(5) of the Act, concerning as it does "terms and conditions of employment," § 8 (d). *Fibreboard* involved an alleged refusal to bargain with respect to the contracting-out of plant maintenance work previously performed by employees in the bargaining unit. The Court recognized that the "termination of employment which . . . necessarily results from the contracting out of work performed by members of the established bargaining unit," *supra,* at 210, is "a problem of vital concern to labor and management . . . ," *supra,* at 211. We further noted, *supra,* at 211–212:

"Industrial experience is not only reflective of the interests of labor and management in the subject matter but is also indicative of the amenability of such subjects to the collective bargaining process.

---

[37] See the Manpower Development and Training Act of 1962, § 102 (1), 76 Stat. 24, which directs the Secretary of Labor to "evaluate the impact of, and benefits and problems created by automation, technological progress, and other changes in the structure of production and demand on the use of the Nation's human resources; establish techniques and methods for detecting in advance the potential impact of such developments; develop solutions to these problems, and publish findings pertaining thereto." The Secretary has, pursuant to this direction, published numerous bulletins. See, *e. g.,* Technological Trends in Major American Industries, Dept. of Labor Bulletin No. 1474.

Experience illustrates that contracting out in one form or another has been brought, widely and successfully, within the collective bargaining framework. Provisions relating to contracting out exist in numerous collective bargaining agreements, and '[c]ontracting out work is the basis of many grievances; and that type of claim is grist in the mills of the arbitrators.' *United Steelworkers* v. *Warrior & Gulf Nav. Co.,* 363 U. S. 574, 584."

See *Local 24, Teamsters Union* v. *Oliver,* 358 U. S. 283, 294. It would therefore be incongruous to interpret § 8 (e) to invalidate clauses over which the parties may be mandated to bargain and which have been successfully incorporated through collective bargaining in many of this Nation's major labor agreements.

Finally, important parts of the historic accommodation by Congress of the powers of labor and management are §§ 7 and 13 of the National Labor Relations Act, passed as part of the Wagner Act in 1935 and amended in 1947. The former section assures to labor "the right . . . to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Section 13 preserves the right to strike, of which the boycott is a form, except as specifically provided in the Act. In the absence of clear indicia of congressional intent to the contrary, these provisions caution against reading statutory prohibitions as embracing employee activities to pressure their own employers into improving the employees' wages, hours, and working conditions. See *Labor Board* v. *Drivers Local Union,* 362 U. S. 274; *Labor Board* v. *International Rice Milling Co.,* 341 U. S. 665, 672–673; *Labor Board* v. *Denver Bldg. Trades Council,* 341 U. S. 675, 687; *Mastro Plastics Corp.* v. *Labor Board, supra,* at 284, 287.

The Woodwork Manufacturers Association and *amici* who support its position advance several reasons, grounded in economic and technological factors, why "will not handle" clauses should be invalid in all circumstances. Those arguments are addressed to the wrong branch of government. It may be "that the time has come for a re-evaluation of the basic content of collective bargaining as contemplated by the federal legislation. But that is for Congress. Congress has demonstrated its capacity to adjust the Nation's labor legislation to what, in its legislative judgment, constitutes the statutory pattern appropriate to the developing state of labor relations in the country. Major revisions of the basic statute were enacted in 1947 and 1959. To be sure, then, Congress might be of opinion that greater stress should be put on . . . eliminating more and more economic weapons from the . . . [Union's] grasp . . . . But Congress' policy has not yet moved to this point . . . ." *Labor Board* v. *Insurance Agents' International Union,* 361 U. S. 477, 500.

## III.

The determination whether the "will not handle" sentence of Rule 17 and its enforcement violated § 8 (e) and § 8 (b)(4)(B) cannot be made without an inquiry into whether, under all the surrounding circumstances,[38] the Union's objective was preservation of work for Frouge's employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case, Frouge, the boycotting employer, would be a neutral bystander, and the

---

[38] As a general proposition, such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry. See Comment, 62 Mich. L. Rev. 1176, 1185 *et seq.* (1964).

agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim.[39] The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees.[40] This will not always be a simple test to apply.[41] But "[h]owever difficult the drawing of lines more nice than obvious, the statute compels the task." *Local 761, Electrical Workers* v. *Labor Board,* 366 U. S. 667, 674.

That the "will not handle" provision was not an unfair labor practice in these cases is clear. The finding of the

[39] See Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8 (b) (4) and 8 (e), 113 U. Pa. L. Rev. 1000, 1018, 1040 (1965).

[40] See *Orange Belt District Council of Painters* v. *Labor Board,* 117 U. S. App. D. C. 233, 328 F. 2d 534 (1964); *Retail Clerks Union Local 770* v. *Labor Board,* 111 U. S. App. D. C. 246, 296 F. 2d 368 (1961); *Todd Shipyards Corp.* v. *Industrial Union of Marine and Shipbldg. Workers,* 344 F. 2d 107 (C. A. 2d Cir. 1965); *Labor Board* v. *Local 825, Int'l Union of Operating Engineers,* 326 F. 2d 218 (C. A. 3d Cir. 1964); *Labor Board* v. *Joint Council of Teamsters,* 338 F. 2d 23, 28 (C. A. 9th Cir. 1964); *Milk Drivers & Dairy Employees Union* (Minnesota Milk Co.), 133 N. L. R. B. 1314, enforced, 314 F. 2d 761 (C. A. 8th Cir. 1963); *Ohio Valley Carpenters District Council* (Cardinal Industries), 136 N. L. R. B. 977 (1962).

[41] See, *e. g., Retail Clerks Union Local 770* v. *Labor Board,* 111 U. S. App. D. C. 246, 296 F. 2d 368 (1961); *Baltimore Lithographers* (Alco-Gravure), 160 N. L. R. B. No. 90, 63 L. R. R. M. 1126 (1966); *Joliet Contractors Assn.* v. *Labor Board,* 202 F. 2d 606 (C. A. 7th Cir. 1953), cert. denied, 346 U. S. 824; *Labor Board* v. *Local 11, United Bro. of Carpenters,* 242 F. 2d 932 (C. A. 6th Cir. 1957). See generally Lesnick, *supra,* n. 39; Comment, 62 Mich. L. Rev. 1176 (1964).

Trial Examiner, adopted by the Board, was that the objective of the sentence was preservation of work traditionally performed by the jobsite carpenters. This finding is supported by substantial evidence, and therefore the Union's making of the "will not handle" agreement was not a violation of § 8 (e).

Similarly, the Union's maintenance of the provision was not a violation of § 8 (b)(4)(B). The Union refused to hang prefabricated doors whether or not they bore a union label; and even refused to install prefabricated doors manufactured off the jobsite by members of the Union. This 'and other substantial evidence supported the finding that the conduct of the Union on the Frouge jobsite related solely to preservation of the traditional tasks of the jobsite carpenters.

The judgment is affirmed in No. 110, and reversed in No. 111.

*It is so ordered.*

APPENDIX TO OPINION OF THE COURT.

The relevant provisions of the National Labor Relations Act, as amended (61 Stat. 141, 73 Stat. 542, 29 U. S. C. § 158), are as follows:

8 (b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or

in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person . . . to enter into any agreement which is prohibited by section 8 (e);

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . . *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further,* That for the purposes of this subsection (e) and section 8 (b)(4)(B) the terms "any employer," "any person engaged in commerce or an industry affecting commerce," and "any person" when used in relation to the terms "any other producer, processor, or manufacturer," "any other em-

ployer," or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this Act shall prohibit the enforcement of any agreement which is within the foregoing exception.

Memorandum of MR. JUSTICE HARLAN.

In joining the Court's opinion, I am constrained to add these few words by way of underscoring the salient factors which, in my judgment, make for the decision that has been reached in these difficult cases.

1. The facts as found by the Board and the Court of Appeals show that the contractual restrictive-product rule in question, and the boycott in support of its enforcement, had as their sole objective the protection of union members from a diminution of work flowing from changes in technology. Union members traditionally had performed the task of fitting doors on the jobsite, and there is no evidence of any motive for this contract provision and its companion boycott other than the preservation of that work. This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the products he uses, for the purpose of acquiring for its members work that had not previously been theirs.

2. The only question thus to be decided, and which is decided, is whether Congress meant, in enacting §§ 8 (b)(4)(B) and 8 (e) of the National Labor Relations Act, to prevent this kind of labor-management arrangement designed to forestall possible adverse effects upon workers arising from changing technology.

3. Because of the possibly profound impacts that the answer to this question may have upon labor-management

relations and upon other aspects of the economy, both sides of today's division in the Court agree that we must be especially careful to eschew a resolution of the issue according to our own economic ideas and to find one in what Congress has done. It is further agreed that in pursuing the search for the true intent of Congress we should not stop with the language of the statute itself, but must look beneath its surface to the legislative history.

4. It is recognized by court and counsel on both sides that the legislative history of § 8 (b)(4)(B), with which § 8 (e), it is agreed, is to be taken *pari passu*, contains only the most tangential references to problems connected with changing technology. Also, a circumspect reading of the legislative record evincing Congress' belief that the statutory provisions in question prohibited agreements and conduct of the kind involved in *Allen Bradley Co.* v. *Local Union No. 3*, 325 U. S. 797, will not support a confident assertion that Congress also had in mind the sort of union-management activity before us here. And although it is arguable that Congress, in the temper of the times, would have readily accepted a proposal to outlaw work-preservation agreements and boycotts, even, as here, in their most limited sense, such a surmise can hardly serve as a basis for the construction of an existing statute.

5. We are thus left with a legislative history which, on the precise point at issue, is essentially negative, which shows with fair conclusiveness only that Congress was not squarely faced with the problem these cases present. In view of Congress' deep commitment to the resolution of matters of vital importance to management and labor through the collective bargaining process, and its recognition of the boycott as a legitimate weapon in that process, it would be unfortunate were this Court to attribute to Congress, on the basis of such an opaque

legislative record, a purpose to outlaw the kind of collective bargaining and conduct involved in these cases. Especially at a time when Congress is continuing to explore methods for meeting the economic problems increasingly arising in this technological age from scientific advances, this Court should not take such a step until Congress has made unmistakably clear that it wishes wholly to exclude collective bargaining as one avenue of approach to solutions in this elusive aspect of our economy.

MR. JUSTICE STEWART, whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE CLARK join, dissenting.

The Union's boycott of the prefitted doors clearly falls within the express terms of the federal labor law, which makes such conduct unlawful when "an object thereof" is "forcing or requiring any person to cease using . . . the products of any other . . . manufacturer . . . ." [1] And the collective bargaining provision that authorizes such a boycott likewise stands condemned by the law's prohibition of any agreement whereby an employer "agrees to cease or refrain from handling . . . any of the products of any other employer . . . ." [2] The Court undertakes a protracted review of legislative and decisional history in an effort to show that the clear words of the statute should be disregarded in these cases. But the fact is that the relevant history fully confirms that Congress meant what it said, and I therefore dissent.

The Court concludes that the Union's conduct in these cases falls outside the ambit of § 8 (b)(4) because it had an ultimate purpose that the Court characterizes as

---

[1] National Labor Relations Act, as amended, § 8 (b)(4)(B), 73 Stat. 543, 29 U. S. C. § 158 (b)(4)(B).

[2] National Labor Relations Act, as amended, § 8 (e), 73 Stat. 543, 29 U. S. C. § 158 (e).

"primary" in nature—the preservation of work for union members. But § 8 (b)(4) is not limited to boycotts that have as their only purpose the forcing of any person to cease using the products of another; it is sufficient if that result is "an object" of the boycott. Legitimate union objectives may not be accomplished through means proscribed by the statute. See *Labor Board* v. *Denver Bldg. Trades Council*, 341 U. S. 675, 688–689.[3] Without question, preventing Frouge from using prefitted doors was "an object" of the Union's conduct here.[4]

It is, of course, true that courts have distinguished "primary" and "secondary" activities, and have found the former permitted despite the literal applicability of

---

[3] As originally drafted, § 8 (b)(4) proscribed only those strikes and boycotts that had "the purpose of" forcing employers to cease using products manufactured by another, etc. The significance of the adoption in conference of the language found in the Act was explained by Senator Taft: "Section 8 (b)(4), relating to illegal strikes and boycotts, was amended in conference by striking out the words 'for the purpose of' and inserting the clause 'where an object thereof is.' Obviously the intent of the conferees was to close any loophole which would prevent the Board from being blocked in giving relief against such illegal activities simply because one of the purposes of such strikes might have been lawful." 93 Cong. Rec. 6859, II Legislative History of the Labor Management Relations Act, 1947 (hereinafter 1947 Leg. Hist.), 1623.

[4] In *Local 598 Plumbers & Steamfitters*, 131 N. L. R. B. 787, the employees of a contractor, Scott Co., boycotted tunnel sections with prefabricated supports manufactured by Eaton. In rejecting a work-preservation "primary purpose" argument like that advanced in this case, the Board stated: "To say that the object of the [union] was to induce or compel Scott Company to assign the work of installing the disputed supports to the [union's] members . . . and not to force Scott Company to cease using Eaton's product or to cease doing business with Eaton is . . . to pretend that the latter object is not a necessary consequence of the former object. The two objects are inseparable. It is immaterial that one objective might be legal if the other is illegal." 131 N. L. R. B., at 800.

the statutory language. See *Local 761, Electrical Workers* v. *Labor Board,* 366 U. S. 667. But the Court errs in concluding that the product boycott conducted by the Union in these cases was protected primary activity. As the Court points out, a typical form of secondary boycott is the visitation of sanctions on Employer A, with whom the union has no dispute, in order to force him to cease doing business with Employer B, with whom the union does have a dispute. But this is not the only form of secondary boycott that § 8 (b)(4) was intended to reach. The Court overlooks the fact that a product boycott for work preservation purposes has consistently been regarded by the courts, and by the Congress that passed the Taft-Hartley Act, as a proscribed "secondary boycott."

In the interim between the passage of § 20 of the Clayton Act, 38 Stat. 738, and the enactment of the Norris-LaGuardia Act, 47 Stat. 70, this Court established that secondary strikes and boycotts were not exempt from the coverage of the antitrust laws. In *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, the anti-trust laws were found applicable to a secondary boycott of the Employer A-Employer B type described above. A refusal to install stone that had not been cut by union labor was held an illegal secondary boycott in *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37. Then in *Painters District Council* v. *United States,* 284 U. S. 582, the Court on the authority of *Bedford Cut Stone* affirmed a decision holding that a product boycott for work preservation purposes was an illegal secondary boycott. The case involved a refusal to install prefinished kitchen cabinets by workmen who sought to secure the work of finishing for themselves.[5]

In 1932 Congress reversed *Duplex* and its progeny by passing the Norris-LaGuardia Act. See *Drivers' Union*

---

[5] See *United States* v. *Painters' District Council,* 44 F. 2d 58.

v. *Lake Valley Co.*, 311 U. S. 91, 100–103; *United States* v. *Hutcheson*, 312 U. S. 219, 229–231, 235–237. But in enacting the Taft-Hartley Act in 1947, 61 Stat. 136, Congress clearly provided that, quite apart from the antitrust laws or the Norris-LaGuardia Act, a product boycott of the kind involved in these cases was to be an unfair labor practice.

A proper understanding of the purpose of Congress in enacting § 8 (b)(4) in that year requires an appreciation of the impact of this Court's 1945 decision in *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797. *Allen Bradley* was a private antitrust action brought against the electrical workers union in New York City. Union members were employed by contractors to install electrical equipment in buildings. Other union members were employed by New York City manufacturers of electrical equipment. As part of a conspiracy between the manufacturers, the contractors and the union, union members refused to install any electrical equipment manufactured outside the city. The Union's interest in this scheme is plainly set forth in the Court's opinion; it was to obtain "work for its own members." 325 U. S., at 799. "The business of New York City manufacturers had a phenomenal growth, thereby multiplying the jobs available for the Local's members." 325 U. S., at 800. Just as in the cases before us, the union enforced the product boycott to protect the work opportunities of its members.[6] The Court found the antitrust laws appli-

---

[6] The present cases, in which the boycotting employees were protecting their own work opportunities, cannot be distinguished from *Allen Bradley* on the ground that there the boycotting employees were protecting the work opportunities of other members of their union. For today in *Houston Insulation Contractors Assn.* v. *Labor Board, post,* p. 664, the Court applies its holding in the present cases to validate a boycott by employees to protect the work opportunities of other workers who were not even members of their union.

cable to the union's role in the scheme, but solely on the ground that the union had conspired with the manufacturers and contractors. . Significantly for present purposes, the Court stated that "had there been no union-contractor-manufacturer combination the union's actions here . . . would not have been violations of the Sherman Act." 325 U. S., at 807. The Court further indicated that, by itself, a bargaining agreement authorizing the product boycott in question would not transgress the antitrust laws. 325 U. S., at 809. In conclusion, the Court recognized that allowing unions to effect product boycotts might offend sound public policy, but indicated that the remedy lay in the hands of the legislature:

> "Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups. That, it is argued, brings about a wholly undesirable result—one which leaves labor unions free to engage in conduct which restrains trade. But the desirability of such an exemption of labor unions is a question for the determination of Congress." 325 U. S., at 810.

Congress responded when it enacted the Taft-Hartley Act. Although there have been differing views within the Court as to the scope of labor unions' exemption from the antitrust laws,[7] the Court in *Allen Bradley* had plainly stated that a work preservation product boycott by a union acting alone fell within that exemption. Two years after the *Allen Bradley* decision, the 80th Congress prohibited such product boycotts, but did so through the Taft-Hartley Act rather than by changing the antitrust

---

· [7] See *United Mine Workers* v. *Pennington,* 381 U. S. 657, 672; *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676, 697, 735.

laws. The Senate report on § 8 (b)(4)(A)[8] of the bill that became law clearly indicates that Congress intended to proscribe not only the Employer A-Employer B model of secondary boycott, but also product boycotts like that involved in *Allen Bradley* and in the cases before us:

"Under paragraph (A) strikes or boycotts, or attempts to induce or encourage such action, are made violations of the act if the purpose is to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. Thus, it would not be lawful for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B; nor would it be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of or does business with employer B (with whom the union has a dispute). This paragraph also makes it an unfair labor practice for a union to engage in the type of secondary boycott that has been conducted in New York City by local No. 3 of the IBEW, whereby electricians have refused to install electrical products of manufacturers employing electricians who are members of some labor organization other than local No. 3. (See ... *Allen Bradley Co.* v. *Local Union No. 3, I. B. E. W.*, 325 U. S. 797.)"[9]

This clear expression of legislative intent is confirmed by the floor debates.[10] It is entirely understandable that

---

[8] In the 1959 amendments to the National Labor Relations Act, § 8 (b)(4)(A) of the original Act was, with changes not here relevant, retitled § 8 (b)(4)(B). See n. 14, *infra.*

[9] S. Rep. No. 105, 80th Cong., 1st Sess., 22, I 1947 Leg. Hist. 428.

[10] A strong supporter of the Act, Senator Ellender, cited the New York City electrical workers' work preservation product boycott as an example of "the secondary boycott" that the Act would prohibit,

Congress should have sought to prohibit product boycotts having a work preservation purpose. Unlike most strikes and boycotts, which are temporary tactical maneuvers in a particular labor dispute, work preservation product boycotts are likely to be permanent, and the restraint on the free flow of goods in commerce is direct and pervasive, not limited to goods manufactured by a particular employer with whom the union may have a given dispute.

Although it was deeply concerned with the extensive restraints on trade caused by product boycotts, the 80th Congress specifically declined to amend the antitrust laws to reach the *Allen Bradley* type of secondary

---

adding that "one can readily understand that such procedure is unconscionable and that it results in high costs to those engaged in the erection of office buildings, homes, and stores . . . ." 93 Cong. Rec. 4132, II 1947 Leg. Hist. 1056. In contrasting the coverage of the Act with shortcomings in the measures suggested by the President, Senator Ball noted that the Administration's proposals "would not touch at all one of the worst situations which has arisen, such as that in New York where a local of the IBEW is using the secondary boycott to maintain a tight little monopoly for its own employees, its own members, and a few employers . . . ." 93 Cong. Rec. 5011, II 1947 Leg. Hist. 1491. Replying to criticisms by Senator Pepper, Senator Taft stated that Senator Pepper's position would entail approval of the New York City electrical workers' product boycott: "The principle announced by the Senator from Florida would make that stand lawful, as it is lawful today. Of course we propose to change the law in that respect." 93 Cong. Rec. 4199, II 1947 Leg. Hist. 1107. Opponents of the bill likewise recognized that the Act would prohibit work preservation boycotts, and at least one of them, Representative Javits, accepted this feature of § 8 (b)(4) but criticized the Act for also prohibiting secondary boycotts that he believed had legitimate purposes. He stated that such legitimate boycotts were "not the kind of boycott which is contrary to the public interest, that other kind results from a misguided labor union's efforts to keep certain goods out of a market because the labor union fears the effect of new inventions or new methods: But while dealing with this . . . abuse, the bill also has the effect of depriving labor of a right of self-preservation which has never been questioned before." 93 Cong. Rec. 6296, I 1947 Leg. Hist. 876.

boycott because it correctly understood that such practices were already directly covered by § 8 (b)(4) of the 1947 Act. The House Conference Report explained why a provision in the House draft that would have amended "the Clayton Act so as to withdraw the exemption of labor organizations under the antitrust laws when such organizations engaged in combinations or conspiracies . . . [to] impose restrictions or conditions upon the purchase, sale, or use of any product, material, machine, or equipment . . ." was dropped in the conference that agreed on the Taft-Hartley Act. It stated that "Since the matters dealt with in this section have to a large measure been effectuated through the use of boycotts, and since the conference agreement contains effective provisions directly dealing with boycotts themselves, this provision is omitted from the conference agreement." [11]

The Court seeks to avoid the thrust of this legislative history stemming from *Allen Bradley* by suggesting that in the present cases, the product boycott was used to preserve work opportunities traditionally performed by the Union, whereas in *Allen Bradley* the boycott was originally designed to create new job opportunities. But it is misleading to state that the union in *Allen Bradley* used the product boycott as a "sword." The record in that case establishes that the boycott was undertaken for the defensive purpose of restoring job opportunities lost in the depression. Moreover, the Court is unable to cite anything in *Allen Bradley,* or in the Taft-Hartley Act and its legislative history, to support a distinction in the applicability of § 8 (b)(4) based on the origin of the job opportunities sought to be preserved by a product boycott. The Court creates its sword and shield distinction out of thin air; nothing could more clearly indicate

---

[11] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 65, I 1947 Leg. Hist. 569.

that the Court is simply substituting its own concepts of desirable labor policy for the scheme enacted by Congress.

The courts and the National Labor Relations Board fully recognized that Congress had intended to ban product boycotts along with other forms of the secondary boycott, and that it had not distinguished between "good" and "bad" secondary boycotts.[12] In a 1949 decision involving § 8 (b)(4), the Board stated that "Congress considered the 'product boycott' one of the precise evils which that provision was designed to curb."[13] The courts agreed. In *Joliet Contractors Assn.* v. *Labor Board,* 202 F. 2d 606, cert. denied, 346 U. S. 824, the Court of Appeals for the Seventh Circuit held that a glaziers' union boycott of preglazed sashes to preserve work they had traditionally performed was an unfair labor practice under § 8 (b)(4). A similarly motivated boycott of prefabricated doors by construction workers was likewise held illegal by the Court of Appeals for the Sixth Circuit in *Labor Board* v. *Local 11, United Bro. of Carpenters,* 242 F. 2d 932. There were no court decisions to the contrary prior to the 1959 amendments to the National Labor Relations Act. Although it made extensive other changes in § 8 at that time, Congress did not disturb

---

[12] In the floor debates, Senator Taft stated that "It has been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them an unfair labor practice." 93 Cong. Rec. 4198, II 1947 Leg. Hist. 1106.

This reading of § 8 (b)(4) is confirmed by the Senate Minority Report, which complained that it "ignores valid distinctions between justified and unjustified boycotts based on the objective of the union in carrying on such a boycott . . . . It indiscriminately bans all such boycotts, whether justified or not." S. Rep. No. 105, Pt. 2, 80th Cong., 1st Sess., 20, I 1947 Leg. Hist. 482.

[13] *United Brotherhood of Carpenters,* 81 N. L. R. B. 802, 806, enforced, 184 F. 2d 60.

the law firmly established by these decisions.[14] The conclusion is inescapable that the Union's boycott of the prefitted doors in these cases clearly violated § 8 (b)(4)(B).[15]

---

[14] In addition to recasting the original § 8 (b)(4)(A) as § 8 (b)(4)(B), the 1959 amendments produced §§ 8 (b)(4)(i) and (ii) expanding the modes of union pressure covered by § 8 (b)(4). See *Labor Board* v. *Servette, Inc.*, 377 U. S. 46, 51–54. Among the changes was the deletion of the Act's original requirement that union pressure on individuals for the objectives proscribed must be pressure commanding "concerted" activity on the part of those individuals. This was the legislative response to *Labor Board* v. *International Rice Milling Co.*, 341 U. S. 665, where the Court had indicated that jobsite picketing directed at truck drivers employed by a customer of the struck employer was not an unfair labor practice because there was no attempt to persuade the truck drivers to engage in "concerted" activity. In addition to dropping the "concerted" activity requirement and thus bringing secondary conduct directed at an individual employee within § 8 (b)(4), Congress also added the proviso that nothing in the amended section "shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." The purpose of this proviso was simply to make clear that Congress did not intend to disturb another ground of the Court's decision in *Rice Milling*—that jobsite picketing of the employees of others was protected primary activity. See *Local 761, Electrical Workers* v. *Labor Board,* 366 U. S. 667, 681.

Thus, the proviso was not intended to modify the distinction between proscribed secondary boycotts and permitted primary strikes and picketing embodied in the original Act. The conference report on the 1959 amendments specifically states that "the changes in section 8 (b)(4) do not overrule or qualify the present rules of law permitting picketing at the site of a primary labor dispute." H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 38, I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (hereinafter 1959 Leg. Hist.), 942. Congress thus intended no change in the Taft-Hartley Act's proscription of product boycotts, which court decisions had consistently recognized as "secondary" and illegal.

[15] What has been said establishes that product boycotts are normally illegal regardless of the employer's contractual relations with the supplier of the boycotted goods, or with other persons. Thus it appears that the concept of "control" which the Board applied in these cases lacks relevance to the correct determination of whether a

In 1959 Congress enacted § 8 (e) to ensure that § 8 (b)(4)'s ban on boycotts would not be circumvented by unions that obtained management's agreement to practices which would give rise to a § 8 (b)(4) violation if the union attempted unilaterally to enforce their observance. In the *Sand Door* decision in 1958,[16] the Court had indicated that the execution of a union-employer agreement authorizing a secondary boycott, and the employer's observance of that agreement, did not constitute an unfair labor practice. Section 8 (e) was the congressional response. Congress also added a new paragraph (A) to § 8 (b)(4), proscribing union pressure on an employer to force him to execute an agreement banned by § 8 (e). It is thus evident that §§ 8 (b)(4)(A), 8 (b)(4)(B) and 8 (e) must be construed in harmony as prohibiting various union methods of implementing the type of boycotts that Congress sought to prohibit in the Taft-Hartley Act. As the Court observes, the sweep of § 8 (e) is no greater than that of § 8 (b)(4). By the same logic, it is no narrower. The relation between the two sections was set forth in *Ohio Valley Carpenters*, 136 N. L. R. B. 977, 987:

> "[T]he validity of a restrictive agreement challenged under 8 (e) must be considered in terms of whether that agreement, if enforced by prohibited means, would result in an unfair labor practice under Section 8 (b)(4)(B). Clearly, there is little point and no logic in declaring an agreement lawful under 8 (e), but in finding its enforcement condemned under 8 (b)(4)(B) . . . ."

Since, as has been shown, the product boycott enforced by the union in the cases before us violates § 8 (b)

§ 8 (b)(4)(B) violation has occurred. Cf. n. 3 to the Court's opinion, *ante*, at 616.

[16] *Local 1976, United Brotherhood of Carpenters* v. *Labor Board*, 357 U. S. 93.

(4)(B), it follows that Rule 17, the provision in the collective bargaining agreement applied to authorize this same boycott by agreement, equally violates § 8 (e). As the Court points out, an important element in the political impetus behind the enactment of § 8 (e) was congressional opposition to "hot cargo" boycotts imposed by the Teamsters Union. But the language and logic of § 8 (e) has a broader scope, and the legislative history clearly establishes that § 8 (e) was intended to prohibit all agreements authorizing product boycotts violative of § 8 (b)(4).[17]

The content of the construction industry proviso to § 8 (e) is also persuasive of that section's principal scope. That proviso exempts only construction industry agreements "relating to the contracting or subcontracting of work to be done at the site of the construction . . . ." The logical inference from this language is that boycotts of products shipped from outside the worksite are prohibited by § 8 (e), and that inference is confirmed by the House Conference Report:

"It should be particularly noted that the proviso relates only and exclusively to the contracting or subcontracting of work to be done at the site of the construction. The proviso does not exempt from

---

[17] The Court and the Board point to H. R. Rep. No. 741, 86th Cong., 1st Sess., 21, I 1959 Leg. Hist. 779, which noted the similarity in language between § 8 (b)(4) and a provision in a Senate bill somewhat similar to what became § 8 (e) and characterized the latter as preserving "the established distinction between primary activities and secondary boycotts." But the "established distinction" embodied in the Taft-Hartley Act and recognized by the courts classified product boycotts as secondary and illegal.

The floor debates show that both proponents and opponents of the Landrum-Griffin bill acknowledged that it would prohibit product boycotts, including those with work preservation purposes. For example, see 105 Cong. Rec. 17884, II 1959 Leg. Hist. 1428 (remarks of Senator Morse); 105 Cong. Rec. 15545, II 1959 Leg. Hist. 1581 (remarks of Representative Rhodes).

section 8 (e) agreements relating to supplies or other products or materials shipped or otherwise transported to and delivered on the site of the construction." [18]

The Court indeed recognizes that the § 8 (e) construction industry proviso does not immunize product boycotts from the reach of that section. By a curious inversion of logic, the Court purports to deduce from this fact the proposition that product boycotts are not covered by § 8 (e). But if § 8 (e) and its legislative history are approached without preconceptions, it is evident that Congress intended to bar the use of any provisions in a collective agreement to authorize the product boycott involved in the cases before us.

Finally, the Court's reliance on *Fibreboard Paper Prods. Corp.* v. *Labor Board,* 379 U. S. 203, is wholly misplaced. That case involved an employer's use of workers hired by an independent contractor to perform in its own plant maintenance work formerly done by its own employees. This reassignment of work was held by the Court to be a mandatory subject of collective bargaining. The circumscribed nature of the decision is established by the Court's careful observation that

"The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant . . . the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." 379 U. S., at 213.

---

[18] H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 39, I 1959 Leg. Hist. 943.

An employer's decision as to the products he wishes to buy presents entirely different issues. That decision has traditionally been regarded as one within management's discretion, and *Fibreboard* does not indicate that it is a mandatory subject of collective bargaining, much less a permissible basis for a product boycott made illegal by federal labor law.

The relevant legislative history confirms and reinforces the plain meaning of the statute and establishes that the Union's product boycott in these cases and the agreement authorizing it were both unfair labor practices. In deciding to the contrary, the Court has substituted its own notions of sound labor policy for the word of Congress. There may be social and economic arguments for changing the law of product boycotts established in § 8, but those changes are not for this Court to make.

I respectfully dissent.