446 F.Supp. 733 (1978)
QUICK SHOP MARKETS, INC., Plaintiff,
v.
RETAIL CLERKS INTERNATIONAL ASSOCIATION et al., Defendants.
Wanda YOUNG et al., Plaintiffs,
v.
RETAIL CLERKS INTERNATIONAL ASSOCIATION et al., Defendants.
Nos. 75-659C(3) and 75-605C(3).
United States District Court, E. D. Missouri, E. D.
March 20, 1978.
*734 Sidney Fortus, Fortus & Anderson, Clayton, Mo., for plaintiff in No. 75-605C(3).
C. A. Kothe, Jerry R. Nichols, Richard L. Barnes, Kothe, Nichols & Wolfe, Inc., Tulsa, Okl., John F. McCartney, Hirsch & McCartney, St. Louis, Mo., for plaintiff in No. 75-659C(3).
Clyde E. Craig and Harry H. Craig, St. Louis, Mo., for defendants Dorsey and Joint Counsel of Teamsters # 13.
John H. Goffstein, Bartley Goffstein, Bollato & Lange, St. Louis, Mo., for defendants Local 655 and Jack Valenti.
Jerome A. Diekemper, Bartley, Goffstein, Bollato & Lange, St. Louis, Mo., for defendants Retail Clerks International Assn., James T. Housewright and Retail Store Employees Union Local # 655.
Harry H. Craig, Wiley, Craig, Armbruster, Wilburn & Mills, St. Louis, Mo., and Robert M. Baptiste, Washington, D. C., for defendants Frank E. Fitzsimmons and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

MEMORANDUM
NANGLE, District Judge.
Plaintiff Quick Shop Markets, Inc. brought this suit pursuant to 29 U.S.C. § 187, seeking damages for an alleged violation of § 8(b)(4) of the Labor Management Relations Act, 29 U.S.C. § 158. Plaintiff Wanda Young and twenty-seven other individuals who are franchisees of plaintiff Quick Shop Markets, Inc. brought similar suit. These causes were consolidated by order of this Court dated March 25, 1976. By agreement of the parties, the trial herein was bifurcated; evidence was adduced only on the issue of liability and the out-of-pocket losses incurred by plaintiff-franchisees. The sole issue before the Court at this time is liability.
This case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1) Plaintiff Quick Shop Markets, Inc. is a corporation organized and existing pursuant to the laws of the state of Missouri. It is engaged in the business of selling food and grocery related products to the public. The remaining plaintiffs are all sole proprietorships with their principal place of business in the state of Missouri, engaging in the retail sale of consumer merchandise. These plaintiffs are all franchisees of plaintiff Quick Shop Markets, Inc. [hereinafter "QSM"]. Defendants Retail Clerks International Association and Retail Store Employees Union, Local 655 are unincorporated associations and labor organizations within the meaning of 29 U.S.C. § 152(5).
2) Since November 12, 1971, defendant Retail Store Employees Union Local 655 [hereinafter "Local 655"] has been the collective bargaining representative of QSM, as certified by the National Labor Relations Board, in a single bargaining unit consisting of:
All employees of the Employer [Quick Shop Markets, Inc.] employed at its retail stores located in the Metropolitan St. Louis area of St. Louis City, St. Louis County, Jefferson County, and St. Charles County, Missouri, including warehousemen, but EXCLUDING store managers, assistant store managers, temporary summer employees, office clerical and professional employees, guards and supervisors as defined in the Act.
3) QSM refused Local 655's demand for negotiations following certification and an unfair labor practice charge, alleging an unlawful refusal to bargain, was filed by Local 655 on January 8, 1973 with the National *735 Labor Relations Board. On July 23, 1973, the Board issued a Decision and Order granting summary judgment against QSM, and ordering it to cease its refusal to bargain. Upon QSM's refusal to comply, the Board petitioned the United States Court of Appeals for the Eighth Circuit for an Order of Enforcement. Said order was issued on March 15, 1974 and a petition for a writ of certiorari was denied by the United States Supreme Court on November 25, 1974.
4) Thereafter, representatives of QSM and Local 655 met for the purposes of negotiating the terms of a collective bargaining agreement. Meetings were held on January 27, 1975; February 17, 1975; April 1, 1975; June 12, 1975; June 26, 1975; September 2, 1975; and October 7, 1975. At the first meeting on January 27, 1975, the attorney for QSM announced that some stores in the area had been franchised and that he did not represent the franchised stores. A copy of the franchise agreement and a list of the franchised stores were requested by Local 655. The list of franchised stores was provided at the February 27, 1975 meeting. An unexecuted copy of the Franchise Agreement form was provided at the April 1, 1975 meeting.
5) QSM commenced franchising stores in November, 1972. One store was franchised in 1972. Three were franchised in 1973. Ten stores were franchised in 1974. Thirty stores were franchised in 1975. The evidence failed to establish the franchising commenced as a result of QSM unionization. Although some evidence was presented tending to indicate that QSM commenced franchising as a result of unionization, the Court finds that the credible evidence totally fails to establish the same.
6) The franchise agreements between QSM and plaintiff-franchisees provides that the franchisees are independent contractors of QSM. The franchisees exercise sole control over their employees, including the right to hire, fire, discipline, compensate and schedule work. The franchisees pay the cost of the state unemployment insurance, social security compensation and workmen's compensation insurance. In consideration of the lease, trademark license and services provided by QSM, the franchisees agree to pay QSM 55% of gross profits realized each calendar quarter. QSM charges the franchisees certain fixed costs including cost of plans, specifications, selection of location and supervision of lease arrangement, initial cash register fund and costs of opening inventory. The franchisees paid from $1,000 to $10,000 in cash to QSM for such costs and tendered promissory notes for the remainder. Franchisees were required to obtain all licenses and business permits, and to pay sales and business taxes and all taxes on inventory and personal property. Under the agreement franchisees are not required to purchase from vendors recommended by QSM, to purchase only that merchandise suggested by QSM, or to sell at prices suggested by QSM. In some cases, franchisee stores are in competition with QSM stores.
7) The franchise agreement establishes an "Owners Working Fund", maintained by QSM, for each franchisee. The fund is debited with the unpaid balance of the franchisee's initial costs and expenses subsequently incurred for the purchase of merchandise and operating costs. The fund is credited with cash receipts deposited on a daily basis by the franchisees. A bookkeeping service is furnished by QSM for the franchisees. On a semi-monthly basis, QSM remits to the franchisees a draw on anticipated profits, debiting the "Owners Working Fund."
8) The franchise agreement may be terminated at any time by the franchisee upon 48 hours' notice. QSM may terminate without cause upon 30 days' notice, or upon 48 hours notice if the franchisee's net worth falls below $3,000, the franchisee fails to make required deposits and reports, bankruptcy is filed, or the franchisee abandons the business.
9) At the commencement of each franchise, most of plaintiff-franchisees were requested by QSM not to initially hire more than 50% of the employees formerly employed by QSM. Most of the franchisees were not sure of the reasons for this request: *736 some thought it was because QSM needed these employees elsewhere; some thought it had something to do with a labor dispute or union. Any employees who went to work for the franchisees first terminated their employment with QSM. The franchisees have not hired a majority of the employees in the QSM certified collective bargaining unit, either collectively or cumulatively.
10) After the hiring of the initial complement of employees, each franchisee hired and fired employees without the approval or authorization of QSM. Each received a manual but was free to depart from its terms, provided that such departure did not violate the franchise agreement. QSM supervisors would visit with each franchisee a few times per week, for short periods of time. These supervisors often made suggestions but the franchisees were free to, and did, ignore the suggestions. Most but not all of the franchisees participated in QSM advertisements; they were not, however, required to do so. QSM suggested prices for merchandise but the franchisees were free to, and did, modify these prices. QSM provided a list of suppliers but the franchisees were free to obtain supplies from suppliers not on the list. No franchisee made arrangements with QSM to do additional work if a strike should occur and none agreed to, or served, as a drop-off point for QSM merchandise during the strike.
11) In general, the franchisees possessed only high school educations. Many of the operations were family-run. Some of the franchisees had managed QSM-owned stores prior to obtaining their franchises.
12) QSM allowed franchisees to become indebted far in excess of the $3,000 limit which would authorize termination. A number of franchisees have terminated their franchise agreements. In those cases, the franchisees owed QSM substantial amounts of money. QSM has not attempted to recover the sums owed.
13) On June 30, 1975, picketing by Local 655 commenced at the stores of all plaintiffs herein, except the stores of plaintiffs Karen Tackett and Kenneth Lorton. Pickets at said stores carried signs bearing the legend: "Quick Shop Employees On Strike. Please Do Not Patronize. Retail Store Employees Union Local No. 655, AFL-CIO". Picketing ceased at the stores of plaintiff-franchisees on August 31, 1975. Picketing ceased at the stores of QSM on October 8, 1975. Prior to the commencement of the strike, Local 655 contacted only a few of the franchisees, demanding recognition. There was submitted no evidence that the employees of the franchisees sought union representation by Local 655.
14) Defendant Retail Clerks International Association also participated in the strike. The Association provided monetary and manpower support during the strike.
15) Only a very few of the employees of QSM or the franchisees participated in the strike.
16) On June 26, 1975, prior to the commencement of the strike, a meeting of QSM store managers and franchisees was held at the Ramada Inn at Westport Plaza in St. Louis. Most but not all of the franchisees attended. The franchisees were informed that their stores might be picketed but that it was anticipated that the picketing would not last long since the franchisees were not involved in the labor dispute.
17) During the strike, most suppliers refused to make deliveries. The franchisees and QSM were forced to travel extensively to pick up merchandise and in some instances were unable to obtain certain merchandise. Plaintiffs were required to employ additional help during this period because of the added burden of obtaining their own merchandise. Customer business dropped off during the strike because of the presence of pickets. There were some incidents of damage and harassment.
18) After hearing the testimony of the witnesses and making determinations as to the credibility thereof, the Court finds that the purpose of the picketing at the franchisees' store was not to obtain recognitional or collective bargaining agreements from the franchisees. Instead, the purpose *737 throughout the strike was to obtain a contract from QSM. Since QSM received 55% of the gross profits of the franchisees, any strike of QSM stores would not result in effective economic pressure unless the stores of the franchisees were also adversely affected by the strike. Accordingly, the Court finds that the true purpose of the picketing was to force the picketed plaintiff-franchisees, their employees and employees of their suppliers to cease dealing, and doing business, with QSM.

CONCLUSIONS OF LAW
This Court has jurisdiction over the subject matter and the parties to this suit in accordance with 29 U.S.C. § 187.
Title 29 U.S.C. § 158 provides in relevant part:
(b) It shall be an unfair labor practice for a labor organization or its agents 
. . . . .
(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal to the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is 
. . . . .
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . ..
In order to find a violation of § 8(b)(4), "the union must have as an object of its picketing (or other activity) the inducement or encouragement of the neutral employees to engage in a concerted refusal to work for their neutral employer, so that the neutral employer will cease doing business with the primary employer . . .". Truck Drivers and Helpers Local Union No. 728, etc. v. Empire State Express, Inc., 293 F.2d 414, 422 (5th Cir. 1961) (emphasis in original); National Woodwork Manufacturers Association v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed. 357 (1967); National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, etc., 228 F.2d 553 (2d Cir. 1955). See also National Labor Relations Board v. Enterprise Association of Steam Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine and General Pipefitters of New York and Vicinity, Local Union No. 638, 429 U.S. 507, 511, 97 S.Ct. 891, 894, 51 L.Ed.2d 1 (1977) in which the Court stated that
. . . this issue turns on whether the boycott was "addressed to the labor relations of the contracting employer vis-a-vis his own employees," [cite omitted] and is therefore primary conduct, or whether the boycott was "tactically calculated to satisfy union objectives elsewhere," [cite omitted] in which event the boycott would be prohibited secondary activity.
Defendant unions contend that plaintiff-franchisees were not neutral employers and that therefore, the picketing was not prohibited by § 8(b)(4). Defendant unions argue that the franchisees were non-neutral allies of QSM. In order to determine whether plaintiff-franchisees are in fact neutrals, United Mine Workers of America v. Osborne Mining Company, Inc., 279 F.2d 716 (6th Cir. 1960) (holding that the question of neutrality is basically a question of fact),
. . . the courts have considered such factors as the extent to which a corporation *738 is de facto under the control of another corporation, the extent of common ownership of the two employers, the integration of the business operations of the employers, and the dependence of one employer on the other employer for a substantial portion of its business. National Labor Relations Board v. Local 810, Steel, Metals, Alloys & Hardware Fabricators & Warehousemen, etc., 460 F.2d 1, 5 (2d Cir. 1972).
See also, Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO v. National Labor Relations Board, 139 U.S.App.D.C. 68, 429 F.2d 747 (1970).
The facts established herein totally refute any argument that the franchisees were non-neutral employers. QSM did not retain de facto control over the franchisees. The mere fact that QSM retained termination rights does not warrant any conclusions of such control. The Southland Corp., 170 NLRB 1332 (1968). There was no common ownership. The business operations, while in some ways related, were not integrated and the franchisees did not depend upon QSM for a substantial portion of its business. In fact, in some instances, franchisees' stores were in competition with QSM stores.
Defendant unions also contend that QSM and plaintiff-franchisees were allied employers. In order to maintain such a defense, defendant unions must establish that the franchisees did work for QSM which, but for the strike, would have been done by employees of QSM. See Kable Printing Co. v. National Labor Relations Board, 93 LRRM 2977 (7th Cir. 1976); National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, etc., supra; Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, 75 F.Supp. 672 (S.D.N.Y.1948); Warehouse Union Local 6, etc., 153 NLRB 1051 (1965). See also, General Drivers and Dairy Employees Union Local 563, etc., 186 NLRB 219 (1970) holding that the criteria for determining an allied employer status are common ownership, common control and integration of operations and management policies. The evidence herein totally negates the existence of such a defense.
Defendant unions also assert that plaintiff-franchisees were successor employers, under a duty to bargain with Local 655; therefore defendants argue that the picketing of the franchisees was primary. In National Labor Relations Board v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Court held that where there is a change in ownership, but the bargaining unit remains the same and a majority of the employees hired by the new employer are represented by a union recognized under the prior employer's tenure, the new employer has a duty to recognize and bargain with the union. The Court noted, however, that
. . . a majority of these employees had been hired by Burns for work in the identical unit. It is undisputed that Burns knew all the relevant facts in this regard and was aware of the certification and of the existence of a collective-bargaining contract. Id. at 278, 92 S.Ct. at 1577.
The certified bargaining unit herein was a geographic one, consisting of all employees of QSM at its retail stores in the St. Louis metropolitan area. The facts adduced herein establish that plaintiff-franchisees did not hire a majority of the employees in the QSM bargaining unit, either collectively or cumulatively. It would therefore appear that Burns, supra, is inapplicable.
Where there is "a nondiscriminatory hiring of a different workforce by a new owner", the new owner may not have a duty to bargain with the union. J. R. Sousa & Sons, 210 NLRB 982, 984 (1974). In such context, however, the Court must determine whether the refusal to hire the predecessor's employees was because of the employees' union membership, or because of the resulting obligation to recognize the union. J. R. Sousa & Sons, supra; Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, etc., 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); National Labor *739 Relations Board v. Foodway of El Paso, 496 F.2d 117 (5th Cir. 1974). Cf. Golden State Bottling Co. v. National Labor Relations Board, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). The evidence herein established that plaintiff-franchisees were instructed not to hire initially more than 50% QSM employees. The franchisees, however, were unaware of the reasons therefor. Some thought that it was because QSM needed experienced employees in QSM stores. Some thought it had some connection with a union or labor dispute. The franchisees did not know, however, that by hiring less than 50% QSM employees, they would not be required to recognize the union. Thus, the hiring and refusal to hire were not "discriminatorily motivated", J. R. Sousa & Sons, supra at 984, and does not mandate a finding of successor-employer status. Plaintiff-franchisees, in general, possessed only high school educations. The purchases of franchises were accomplished without the advice of counsel. They were not sophisticated businessmen, experienced in matters of labor relations. The operations were run, for the most part, by the franchisee and family. To hold these franchisees to be successor-employers under these circumstances, because of vague instructions from QSM concerning initial hiring, would be to stretch the concept of successor-employer far beyond the context in which it developed.
Defendant unions assert that QSM and plaintiff-franchisees were single employers, or co-employers, and thus the picketing of franchisees' stores was primary. In order to determine the validity of such a defense, the Court must consider the factors of common ownership, common control of labor policy and integration of operations. Parklane Hosiery Co., Inc., 203 NLRB 597 (1973); Elias Brothers Big Boy, Inc., etc., 137 NLRB 1057 (1962); Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO v. National Labor Relations Board, supra. The facts adduced herein are very similar to those presented in The Southland Corp., supra, wherein it was concluded that the franchisee was not a co-employer with the franchisor, nor could the two be considered as a single employer. The Board noted that the franchisor only recommended pricing and suppliers; the franchisee was free to set his own prices and choose his own suppliers. There was no evidence of control over the labor policy of the franchisee. The Board concluded that the termination provision in the franchise agreement did not negate the independent status of the franchisor. In the instant case, the same facts exist. QSM recommended prices and vendors but plaintiff-franchisees were free to ignore the recommendation. Here too the evidence negates any contention that QSM retains control over franchisees' labor policy. Accordingly, the Court concludes that QSM and plaintiff-franchisees can not be considered as a single employer or co-employer.
Defendant unions also contend that the picketing was recognitional; that the unions were picketing plaintiff-franchisees to obtain recognition of the unions' status as bargaining agents for the employees of the franchisees. The Court has found otherwise. The signs carried by the pickets herein did not mention recognition as a goal. Little effort was made to demand recognition of the union. Local 655 possessed no evidence that the employees of the franchisees desired representation by the union. Under these circumstances, the Court must conclude that the claim of recognitional picketing must be denied. Cf., United Brotherhood of Carpenters and Joiners of America, Local No. 1849, AFL-CIO, 208 NLRB 461, 462 (1974) (stating that use of the word "strike" on a picket sign constitutes more than publicity; it is "a `signal' to other employees to respect a picket line."); Local 212, Retail Clerks International Association, 140 NLRB 1258 (1963); Grain Millers Local 16 (Bartlett & Co.), 141 NLRB 974 (1963); Flame Coal Company v. United Mine Workers of America, 303 F.2d 39, 42 (6th Cir. 1962) (the court stating "[t]his union cannot escape the charge of secondary boycott because it chose to attack on all fronts at once, claiming its desire and *740 objective to be the organization of all involved . . .").
The Court has found that the true object of the picketing was to induce plaintiff-franchisees, their employees, and the employees of their suppliers to cease doing business with QSM. Plaintiff-franchisees were not successor-employers, or co-employers, nor can the franchisees and QSM be considered a single employer. The evidence negates any finding that plaintiff-franchisees were allied or non-neutral employers. Accordingly, the Court concludes that defendant unions violated § 8(b)(4) in picketing the stores of plaintiff-franchisees.