RETAIL CLERKS' INTERNATIONAL UNION AND RETAIL STORE EMPLOYEES' UNION, LOCAL 655, Appellants,

v.

QUICK SHOP MARKETS, INC. and Wanda Young d/b/a Quick Shop Store # 1032, Spouse, Carl Young (6/18/76), Ronnie Gillihan d/b/a Quick Shop Store # 1090, Spouse, Linda Gillihan (6/18/76), Eugene Webb d/b/a Quick Shop Store # 1002, Spouse, Dona Webb (6/18/76), Jerry L. Webb d/b/a Quick Shop Store # 1074, Spouse, Florence Webb (6/18/76), Francis LeTrello d/b/a Quick Shop Store # 1079, Sidney Frischer d/b/a Quick Shop Store # 1080, Roy Eckles d/b/a Quick Shop Store # 1085, Spouse, Rosemary Eckles (6/18/76), George Kleen d/b/a Quick Shop Store # 1075, Spouse, Margie Ann Kleen (6/18/76), Roger St. Onge d/b/a Quick Shop Store # 1083, Spouse, Wilma St. Onge (6/18/76), Kenneth Kennedy d/b/a Quick Shop Store # 1030, Spouse, Kathleen Kennedy (6/18/76), Jerry Cook d/b/a Quick Shop Store # 1054, Spouse, Rebecca Cook (6/18/76), Jerome Whitehead d/b/a Quick Shop Store # 1020, Spouse, Marian Whitehead (6/18/76), Edward Foelsch d/b/a Quick Shop Store # 1015, Spouse, Barbara Foelsch, Robert Hodge d/b/a Quick Shop Store # 1062 and Quick Shop Store # 1003, Robert Holthaus d/b/a Quick Shop Store # 1025, Spouse, Linda Holthaus (6/18/76), Mildred Mullins d/b/a Quick Shop Store # 1038, Ford Maness d/b/a Quick Shop Store # 1042, Spouse, Ellen Maness (6/18/76), Fay Johnson d/b/a Quick Shop Store # 1060, Spouse, Jesse Johnson (6/18/76), Walter Bradford d/b/a Quick Shop Store # 1062, Spouse, Alice Bradford (6/18/76), Stephen Koziatek d/b/a Quick Shop Store # 1047, Spouse, Charlotte Koziatek (6/18/76), Joan Emerson d/b/a Quick Shop Store # 1053, Albert Kozenski d/b/a Quick Shop Store # 1001, Giles Poynter (2/10/76) d/b/a Quick Shop Store # ——, Spouse, Patricia A. Poynter (6/18/76), Robert Poynter d/b/a Quick Shop Store # 1006, Spouse, Patricia J. Poynter (6/18/76), Dennis Jorel d/b/a Quick Shop Store # 1048, Spouse, Connie Jorel (6/18/76), James Hessel d/b/a Quick Shop Store # 1037, and Larry Watson d/b/a Quick Shop Store # 1089, Appellees.

No. 78–1384.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1978.

Decided Aug. 22, 1979.

Jerome K. Diekemper, Diekemper, Hammond & Shinners, Clayton, Mo., argued, for appellants and on brief, for appellant, Retail Store Employees Union Local No. 655.

Richard Roesel, Retail Clerks International Union, Washington, D. C., and George R. Murphy, Washington, D. C., on brief, for appellant, Retail Clerks International Union, etc.

Sidney Fortus, Fortus & Anderson, Clayton, Mo., argued and on brief, for appellees.

Before LAY and HEANEY, Circuit Judges, and HANSON,* Senior District Judge.

LAY, Circuit Judge.

This is an action for damages under Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187. The Retail Clerks International Union and Retail Store Employees Union, Local 655 (Local 655), appeal from a judgment of the district court, the Honorable John F. Nangle, that

* The Honorable William C. Hanson, United States District Court for the Northern and Southern Districts of Iowa, sitting by designation.

they violated Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), by picketing Quick Shop convenience stores operated by franchisers of Quick Shop Markets, Inc. (QSM). *Quick Shop Mkts. v. Retail Clerks Int'l Ass'n,* 446 F.Supp. 733 (E.D. Mo.1978). The suit was originally brought by QSM and 28 franchisers that operate stores at different locations in the St. Louis, Missouri area. The court based liability upon the finding that the purpose of the picketing was to boycott the franchisers in order to force them to cease doing business with QSM.[1] On appeal the unions contend the court erred in finding the picketing constituted illegal secondary activity; they argue the picketing was lawful because the franchisers were not neutrals in their dispute with QSM. We hold the district court erred and therefore vacate the judgment.

We deem the historical background concerning QSM's dispute with Local 655 highly significant in evaluation of the claim made by the plaintiffs against the unions. In 1971 Local 655 waged an organizing campaign among QSM's employees that culminated on September 29, 1971, with a union victory in a National Labor Relations Board election. The regional director of the Board overruled QSM's objections to the election and certified Local 655 as the bargaining representative of all employees of QSM employed at its retail stores located in metropolitan St. Louis, Missouri. Following a hearing on QSM's motion to reconsider its denial of review, the Board entered a decision and order on December 11, 1972, certifying Local 655 as the bargaining representative for QSM's employees. *Quick Shop Mkts., Inc.,* 200 N.L.R.B. 830, 81 L.R. R.M. 1594 (1972). Meanwhile, on November 16, 1972, QSM franchised its first store.

On January 4, 1973, Thomas Tinsley, president of QSM, met with Eugene O'Neill, president of a grocery supplier. As was his custom Mr. O'Neill prepared a memorandum of the meeting for his rec-

1. Trial was bifurcated and only the issue of liability was decided. This appeal is from that judgment, certified by the district court under Fed.R.Civ.P. 54(b).

ords. Paragraph three of the memorandum states Tinsley told O'Neill increasing pressure to unionize QSM might be one of the considerations that would accelerate the trend toward franchised operations of Quick Shop stores. The record bears out Tinsley's prediction. As the likelihood of QSM being compelled to bargain with Local 655 increased, so too did QSM's franchising program.

QSM refused Local 655's demand for negotiations following the certification, whereupon Local 655 on January 8, 1973, filed an unfair labor practice charge against QSM, alleging an unlawful refusal to bargain. On July 9, 1973, QSM franchised its second store. On July 23, 1973, the Board ordered QSM to bargain with Local 655. *Quick Shop Mkts., Inc.,* 204 N.L.R.B. 1150, 83 L.R.R.M. 1579 (1973).

When QSM refused to comply with the order to bargain, the Board petitioned this court on October 1, 1973, for enforcement of its order. On that same date QSM franchised its third store. QSM's franchising program then picked up speed. Between the October 1 date and March 15, 1974, the date this court initially ordered enforcement, QSM franchised five stores. On November 25, 1974, the United States Supreme Court denied QSM's petition for certiorari. Between the date of this court's initial order and the date of the denial of certiorari, QSM franchised an additional four stores. Between the November 25 date and the day after the first bargaining session, January 28, 1975, QSM franchised eight more stores.[2]

Local 655 officials first learned of QSM's franchising program at the first bargaining session on January 27, 1975, when QSM officials announced that some of the stores had been franchised and that QSM did not represent those stores. At that time QSM's counsel stated the franchise stores "come squarely under the *Burns* concept," and may have an obligation to bargain.

The phrase, "*Burns* concept," was an obvious reference to the Supreme Court's decision in *NLRB v. Burns Int'l Security Serv., Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and expressed the attorney's opinion that the franchisers actually succeeded to QSM's obligation to bargain with Local 655. At the commencement of each franchise, QSM's supervisors advised prospective franchisers not to hire more than 50% of the employees formerly employed by QSM. The supervisors were acting on the orders of Thomas Tinsley, president of QSM, who told them company counsel advised him the 50% limitation was necessary to avoid a "Burns Act" problem.

Union officials promptly requested a list of names of franchisers and addresses of franchised stores. Four more stores were franchised before QSM gave Local 655 the requested list of names and addresses on February 27, 1975. On April 1, 1975, QSM complied with the union's request for a copy of the franchise agreement form. In the

---

**2.** The terms of the franchise agreements are detailed in the district court's opinion. 446 F.Supp. at 734–37. It is sufficient to restate here that the franchisers agreed to pay QSM 55% of the gross profits realized each calender quarter in consideration for leases of the stores and fixtures, trademark, licenses and services provided by QSM. QSM also charged the franchisers certain fixed costs, including cost of the initial cash register fund and the cost of the opening inventory for which the franchisers paid from $1,000 to $10,000 in cash and tendered promissory notes for the remainder. The franchise agreements established an "Owners Working Fund" maintained by QSM for each franchiser, which was debited with the unpaid balance of the franchiser's initial costs and expenses subsequently incurred for the purchase of merchandise and operating costs. The fund was debited semi-monthly by a draw on anticipated profits which QSM remitted to the franchisers. The fund was credited with cash receipts deposited by the franchisers on a daily basis. The franchise agreements could be terminated at any time by the franchisers upon 48 hours notice. QSM could terminate the agreement without cause on 30 days notice or on 48 hours notice if, *inter alia,* the franchiser's net worth fell below $3,000. However, QSM did not exercise its right of termination in the latter instance. The record shows that QSM allowed franchisers to run up negative net worths far in excess of those that would have justified termination and made no effort to recover substantial amounts of money from the heavily indebted franchisers who terminated their franchises after the strike.

**584**

meantime QSM had franchised two more stores. By the time of the fifth bargaining session, June 12, 1975, QSM had franchised six stores, bringing the total number of franchised stores to 32, or almost half the bargaining unit.

After the June 12, 1975, meeting an impasse was reached in the negotiations. On June 19, 1975, Local 655 had a staff meeting at which plans were made to picket stores operated both by QSM and the franchisers. Staff members were directed to call on all Quick Shop stores to inform them of the pending strike and to enlist the aid of employees in picketing. Staff members were also directed to tell all franchisers the history of Local 655's involvement with QSM, request negotiations and attempt to obtain recognition or bargaining agreements from the individual franchisers with the promise that if a franchiser signed, there would be no picketing at that particular store.

QSM and Local 655 met for a sixth time on June 26, 1975, but did not reach an agreement. In the interim QSM had franchised two more stores. On June 30, 1975, the picketing which is the subject of this litigation commenced at all but two Quick Shop stores within the geographical area of the certified bargaining unit. The pickets carried signs which read: "Quick Shop Employees on Strike. Please Do Not Patronize. Retail Store Employees Local 655." The picketing continued in full force until August 31, 1975, when Local 655 abandoned picketing of the franchised stores. After two more negotiating sessions, Local 655 on October 8, 1975, ceased picketing the stores operated by QSM. By strike's end, QSM had franchised 40 stores.

The district court found the purpose of the picketing was not to obtain recognition of Local 655's status as the bargaining representative of the franchisers' employees but to induce the franchisers, their employees and the employees of their suppliers to

cease doing business with QSM. We set this finding aside as clearly erroneous. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Fed.R.Civ.P. 52(a).

Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, provides a claim for damages due to conduct that violates Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), which prohibits secondary boycotts. Following the language of the statute, a secondary boycott may be defined as the use of economic pressure on "any person engaged in commerce, where 'an object' of the inducement or coercion is to require any person to cease doing business with any other person." *NLRB v. Pipefitters Local 638,* 429 U.S. 507, 510, 97 S.Ct. 891, 894, 51 L.Ed.2d 1 (1977).[3] Thus, the issue is whether "an object" of Local 655's picketing of the franchised stores was to cause the cease-doing-business consequence prohibited by Section 8(b)(4), which in turn depends upon whether Local 655's conduct was addressed to the labor relations of the franchisers with their own employees or "was 'tactically calculated to satisfy [its] objectives elsewhere' . . . ." *Id.* at 511, 97 S.Ct. at 894–95 (quoting *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 644, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)).

We do not find sufficient factual support in the record for the finding that the unions violated Section 8(b)(4); to the contrary, when considered in light of the historical facts leading up to the strike, we find the overwhelming weight of the evidence supports the unions' contentions. We agree with the unions that the evidence demonstrates the sole object of Local 655's picketing of the franchisers was to obtain recognition and have them sign contracts for Local 655 to represent their employees.

It cannot be disputed that, when the bargaining sessions reached an impasse, Local

**3.** One commentator defines a secondary boycott as "the application of economic pressure upon a person with whom the union has no dispute regarding its own terms of employment in order to induce that person to cease doing business with another employer with whom the union does have such a dispute." R. Gorman, Basic Text on Labor Law, Unionization, and Collective Bargaining 240 (1976).

655 officials decided to seek contracts with the franchisers and then strike all Quick Shop stores not under contract. The record shows that at the June 18, 1975, meeting, Local 655's business agents were told to try to talk to franchisers, explain the history of Local 655's dispute with QSM, and inform them that if they signed a recognition agreement and entered negotiations with Local 655, they would not be picketed. The record is replete with undisputed evidence that Local 655's business agents carried out their instructions. QSM president Thomas Tinsley admitted he received reports from franchisers before and during the strike that Local 655 had demanded the franchisers sit down and negotiate, and stated he "heard that Local 655 had been out trying to write a separate contract for [the franchisers] . . . ." Franchiser Ford Maness wrote Tinsley a memorandum stating that two union representatives had visited his store, asked him to sign a recognition agreement and told him if he signed, his store would not be picketed. Memoranda to Tinsley from QSM's franchise supervisors reflected recognition demands that Local 655's agents made on certain franchisers. In addition franchisers who were not personally contacted by union agents conceded that union agents had visited their stores to organize their employees and ask them to walk picket. The Board has long held that a demand for recognition immediately preceding picketing or oral requests to employees to join a union manifests a recognitional objective. *Retail Clerks Local 345,* 145 N.L.R.B. 1168, 55 L.R.R.M. 1122 (1964).

The recognitional objectives of Local 655's conduct are also demonstrated by a telephone conversation between counsel for Local 655 and counsel for the franchisers that took place shortly after the picketing began. According to the franchisers' counsel, Local 655's counsel said that "he wanted to negotiate with the [franchisers], my clients, and that the Union would let the [franchisers] out cheap, is the word he used, and that the real target in the matter was Quick Shop Markets, Incorporated." Franchisers' counsel admitted he understood the statement to mean if the franchisers signed

contracts, the pickets would be removed from their stores. Such conduct clearly reflects a recognitional objective. *Teamsters Local 445,* 145 N.L.R.B. 263, 54 L.R.R.M. 1359 (1963). Statements that pickets will be removed when recognition is obtained likewise evidence a recognitional objective. *Retail Clerks Local 212,* 140 N.L.R.B. 1258, 52 L.R.R.M. 1215 (1963).

That the franchisers were aware of the recognitional objective behind Local 655's conduct is reflected by a newspaper advertisement in the St. Louis papers, sponsored by the franchisers, stating that Local 655 was picketing the store of franchiser Wanda Young in order to organize her employees. In pertinent part the advertisement read:

> I am fighting a union I have had nothing to do with, most of my employees are my children and girls I have known since they were young girls in school. We are all very close and don't need anyone to talk for us. There are my 3 children and the 2 other girls, my mother fills in when we need to be off. That's the crew the union (I guess) wants to organize . . .

Several other franchisers stated they knew of Local 655's recognitional demands through the picketing of their stores; in a few cases employees of the franchisers participated in the picketing. In light of this evidence, the fact that approximately six franchisers denied any knowledge that Local 655's business agents had visited their stores is of little weight.

The district court rejected the unions' claim that the purpose was recognitional on the grounds that the pickets' signs did not mention recognition as a goal, little effort was made to demand recognition and the unions possessed no evidence that the employees of the franchisers desired representation by Local 655. Additionally, plaintiffs point out that picket signs did not differentiate between QSM stores and franchised stores.

The object of Local 655's picketing must be ascertained from its overall con-

duct, including events which preceded as well as those that accompanied the picketing. *Retail Clerks Local 345,* 145 N.L.R.B. 1168, 55 L.R.R.M. 1122 (1964). In light of overwhelming evidence that the object of the picketing was recognition, it is of no consequence that the picket signs did not explicitly give recognition as an objective. Given the fact that all the stores did business as "Quick Shops," there was no need to differentiate between QSM stores and franchised stores. Further, we agree with the union that the legend, "Employees on Strike," demonstrates a recognitional object. *See United Bhd. of Carpenters & Joiners Local 1849,* 208 N.L.R.B. 461, 85 L.R.R.M. 1493 (1974). Nor does the fact that Local 655 had little evidence of employee support show that the picketing did not have a recognitional object. *See, e. g., Retail Clerks Local 1557,* 217 N.L.R.B. 4, 89 L.R.R.M. 1379 (1975).[4]

Plaintiffs contend the fact that Local 655 did not comply with Section 8(b)(7)(C) of the National Labor Relations Act, 29 U.S.C. § 158(b)(7)(C), by requesting an election from the NLRB within 30 days of the initiation of picketing against the franchisers "is presumptive proof of the unions' intent that the picketing was not an effort to gain recognition from the franchisees [sic] . . . ." Plaintiffs draw the same con-

clusion from Local 655's failure to conduct a traditional organizing campaign, i.. e., obtaining pledge cards, sending follow-up letters confirming demands made in person, etc. Local 655's response is that they in good faith believed that the franchisers were successors to QSM's bargaining obligation. The district court found the successorship doctrine inapplicable because the franchisers "did not hire a majority of the employees in the QSM bargaining unit, either collectively or cumulatively." *Quick Shop Mkts. v. Retail Clerks Int'l Ass'n,* 446 F.Supp. at 738. The court also found the franchisers' hiring was not discriminatory, and concluded that the franchisers were not successor employers.

The union urges that at least eleven stores hired a majority of former QSM employees when members of the franchisers' families are not counted.[5] It urges that therefore, under *NLRB v. Burns,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), it has established the franchisers were successors, either because they employed a majority of QSM employees or because, at QSM's direction, they discriminated by refusing to select more than 50% of their labor from former QSM employees because of their membership in the union. *See K. B. & J. Young's Super Mkts., Inc. v. NLRB,* 377

---

**4.** The plaintiffs place great significance on the fact that only a few employees of the franchisers participated in the picketing. This overlooks the fact that Local 655 had won an election to represent QSM employees and was constantly frustrated in its attempt to bring QSM to the bargaining table. The fact that QSM in concert with the franchisers sought to limit employees to 50% of those who worked for QSM at the time of the election, an obvious discriminatory tactic, readily explains the small number of pickets who were actual employees. As we later discuss, Local 655 maintained a good faith belief, and was warranted in doing so, that the franchising was a sham tactic by QSM and that it still represented all employees as a certified bargaining representative.

**5.** Because the district court concluded that *NLRB v. Burns,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), did not apply, it failed to make a store by store inquiry. Had it done so it would have found that six franchisers hired a majority of employees formerly employed by QSM. The record reflects that franchisers Mul-

lins, Bradford, Hodge, Lorton, Webb and Holthaus hired a majority of their initial employee complement from QSM. The unions also argue tht franchisers Poynter, Koziatek, Eckles and Maness hired QSM employees as a majority of their *statutory* complement of employees although not a majority of their total employees. The unions rely on Section 2(3) of the Labor Management Relations Act, 29 U.S.C. § 152(3), which provides that the term "employee" shall not include any individual employed by his parent or spouse; such individuals are excluded on a per se basis. In the case of other relatives, however, the NLRB has required the showing of a special status or other facts which prevent the existence of a community of interest with other employees. In *NLRB v. Caravelle Wood Prods., Inc.,* 466 F.2d 675 (7th Cir. 1972), the Seventh Circuit rejected the Board's exclusion of family members solely on the basis of family relationships. We are unable to discern from the record anything other than the existence of a family relationship.

F.2d 463, 465 (9th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967); *NLRB v. Foodway of El Paso,* 496 F.2d 117, 120 (5th Cir. 1974).

The district court did not apply the *Burns* doctrine on the erroneous ground that the successorship rule is inapplicable where the original bargaining unit is a larger geographic one and the "successors" are smaller diverse units.[6]  It also rejected the unions' argument that the franchisers became successors due to their admitted discrimination against union members in hiring.  The court did so on the ground that not all of the franchisers knew why QSM told them to limit their employees to not over 50% of QSM former employees.[7]  In light of our finding that the object of Local 655's picketing was recognition by the franchisers, we need not decide whether all of the franchisers fall within the scope of the *Burns* successorship doctrine.  More relevant here is whether the union has successfully rebutted the claim that its intent was to illegally boycott the franchisers.

Local 655's good faith belief that it was the certified bargaining representative of the franchisers' employees is demonstrated by: (1) its legitimate concern over QSM's timing of its franchising with the success of unionization; (2) early recognition by counsel for the franchisers that the franchisers could be obligated to bargain under the *Burns* doctrine; (3) the fact that it had finally received, after many years of litigation, this court's enforcement of the Board's order certifying representation under an election; (4) the strong implication from the manner in which the franchising was being carried out that it was a direct result of QSM's attempt to avoid recognition; (5) the lack of any real legitimate motivation for QSM's conduct other than avoidance of bargaining with the certified representatives of its employees.  Further corroboration of the anti-union animus manifested by QSM and its franchisers is the 50% hiring limitation set by QSM for its franchisers in order to avoid the effect of the *Burns* doctrine.

6.  There is no requirement that the successor's bargaining unit be coexistent in geographic scope with the predecessor's bargaining unit.  *See NLRB v. Band-Age, Inc.,* 534 F.2d 1 (1st Cir.), *cert. denied,* 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976); *Nazareth Regional High School v. NLRB,* 549 F.2d 873 (2d Cir. 1977) (diminution in unit size is insufficient to rebut a presumption of continued majority status); *Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131 (7th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974) (Board may treat a greatly reduced bargaining unit as a miniature of the former unit).  In *NLRB v. Fabsteel Co.,* 587 F.2d 689, 695 (5th Cir. 1979), the court rejected the approach taken by the district court here:

> The Board has long held, with court approval, that under proper circumstances, the obligation to bargain with an incumbent union may be found although the work force is considerably diminished by the transfer.  *See, e. g., NLRB v. Polytech, Inc.,* 469 F.2d 1226, 1230 (8th Cir. 1972); *NLRB v. McFarland,* 306 F.2d 219, 221 (10th Cir. 1962); *NLRB v. Armato,* 199 F.2d 800, 803 (7th Cir. 1952).  The Board, with court approval, has similarly found a bargaining obligation though the transfer in ownership results in a division of the bargaining unit into two or more separate units, where, as here, each unit is independently appropriate.  *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 880 (2 Cir. 1977); *Zim's Foodliner, Inc. v.*

*NLRB,* 495 F.2d 1131, 1141 (7th Cir.), *cert. denied* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974); *NLRB v. Geronimo Service Co.,* 467 F.2d 903 (10th Cir. 1972); *Ranch-Way, Inc.,* 445 F.2d 625 (10th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 940, 92 S.Ct. 2037, 32 L.Ed.2d 328 (1972).  As the seventh circuit has stated,

> Once it is determined that the successor unit is appropriate for bargaining, a change in unit definition, from large to smaller units, would seem not to raise any additional considerations beyond those [posed by a numerical diminution in unit size].

*Zim's Foodliner, Inc. v. NLRB, supra,* at 1141.

7.  The record does not support the district court's finding that the franchisers' hiring of former QSM employees was not discriminatory.  Tinsley stated that QSM did not hide from the franchisers the fact that QSM had a dispute with Local 655 and that they might inherit a union if they hired in excess of 50% of former QSM employees.  QSM franchise supervisors stated they made that point clear during the franchise negotiations.  Most of the franchisers admitted QSM informed them of the pending labor dispute with Local 655.  Even the district court found that some of the franchisers knew QSM's hiring limitation "had something to do with a labor dispute or union."  *Quick Shop Mkts.,* 446 F.Supp. at 736.

We cannot agree with the district court's view that the evidence failed to establish QSM's franchising program was the result of unionization. The overwhelming evidence is to the contrary. QSM did not franchise its first store until after its objections to Local 655's election victory were overruled by the Board's regional director. As the chronology of events leading up to and through the strike shows, the pace of QSM's franchising program quickened as its presence at the bargaining table became more and more imminent. QSM contends an onus should not be cast upon its choice to exhaust fully its legal resources in contesting Local 655's election victory. However, QSM did not offer any evidence bearing on the motive underlying the franchising program. On this record, QSM cannot avoid the strong implication that its motive was an unlawful attempt to avoid its bargaining obligation. Evidence of this motive is O'Neill's memorandum, which attributes to QSM's president, Tinsley, the statement that increasing union pressure may be a factor in accelerating franchising.

QSM's motive is also shown by the fact that the franchising program was structured from its inception to ensure that franchisers could not legally succeed to QSM's bargaining obligation. As QSM's counsel's statement to Local 655 when he first informed it of the existence of the franchised stores illustrates, he was aware of the possibility the franchisers might have an obligation to negotiate with Local 655. QSM's franchise supervisors testified they were instructed by Tinsley, acting on the advice of company counsel, to limit the number of QSM employees the franchisers hired.

Finally QSM's motive is also shown by the financial relationship between QSM and the franchisers. Paragraph 5.01 of the franchise agreement provided that QSM would remit each month a specified amount as a draw against anticipated profits, pay-

able from the Owners Working Fund Account. The draw could be reduced if it exceeded eight per cent of the net sales or payroll. In actuality, however, seven franchisers received semi-monthly draws exceeding the specified percentage; none suffered a reduction.

The franchise agreement also provided for summary termination if the owner's net worth fell below $3,000. In practice, however, QSM permitted franchisers to operate with net worths far less than $3,000. QSM permitted some franchisers to continue operating, with net worths that were declining, until the threat of unionization passed. Finally, when the franchisers operating with significant negative net worths terminated their franchises, QSM made no attempt to recover the sums owed.[8] In view of these undisputed facts, the district court's finding that QSM's franchising program was not the product of unionization is clearly erroneous.

The sole evidence supporting the finding that the picketing was not to obtain recognition or collective bargaining agreements, but rather to obtain a contract with QSM, was the inference the district court drew from a provision of the franchise agreement:

> Since QSM received 55% of the gross profits of the franchisees [sic], any strike of QSM stores would not result in effective economic pressure unless the stores of the franchisees [sic] were also adversely affected by the strike. Accordingly, the Court finds that the true purpose of the picketing was to force the picketed plaintiff-franchisees [sic], their employees and employees of their suppliers to cease dealing, and doing business, with QSM.

*Quick Shop Mkts.*, 446 F.Supp. at 737.

In other words, because Local 655 was seeking a contract with QSM and the probable and foreseeable effect of picketing the

---

8. When QSM terminated Dennis Jorel's franchise on November 11, 1975, his negative net worth was around $20,000. When QSM terminated Robert Hodge's franchise on November 16, 1976, his negative net worth was around $35,000. When it terminated Kenneth Kenne-

dy's franchise on October 27, 1976, his negative net worth was approximately $12,000. Mildred Mullins terminated November 10, 1976, $12,000 in the red; Karen Tackett on November 9, 1976, more than $5,000 in the red; George Kleen on November 11, 1976, $6,000 in the red.

franchised stores was to put more effective economic pressure on QSM, the district court found the purpose of the picketing was to induce the franchisers to cease doing business with QSM. We must respectfully disagree with this reasoning. The court failed to consider the fact that Local 655 had a legitimate labor dispute with the franchisers. As certified bargaining representative of the employees of all QSM stores, Local 655 recognized the vast majority of employees in the convenience food stores formerly owned by QSM were now working in stores owned by franchisers. As our review of the record shows, Local 655 sought recognition and bargaining agreements with the franchisers and when it was unsuccessful, picketed the franchised stores. Such conduct is the paradigm of primary activity. Under these circumstances, any pressure on QSM resulting from Local 655's actions against the franchised stores was a lawful incidental effect of primary activity. *See NLRB v. International Rice Milling Co.,* 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (1951). At no time did Local 655 ever seek to bargain with QSM concerning the employees of the franchised stores, nor did Local 655 ever indicate that the franchisers could terminate the picketing by ceasing to do business with QSM or that QSM could terminate the picketing of the franchised stores by signing an agreement covering its stores. *Compare NLRB v. Building & Constr. Trades Council,* 359 F.2d 62, 64 (3d Cir. 1966). Local 655's conversation with franchisers' counsel established that each franchiser could terminate the picketing simply by signing a contract.

The reach of Section 8(b)(4) has "stopped short of proscribing . . . activity having the object of pressuring the employer for agreements regulating relations between him and his own employees." *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 620, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357 (1967). Since the unions' conduct involved only a primary dispute with the franchisers, it is expressly protected by the proviso that Section 8(b)(4) shall not be construed "to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. § 8(b)(4)(B).

Since we find the unions' activity was primary picketing and not otherwise in violation of Section 8(b)(4) it is not necessary to pass on the unions' other contentions.

Reversed and remanded with instructions to dismiss the complaint.